PAUL SMALL ARTISTS, LTD., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77663.    Filed November 17, 1961.

*Jerald S. Schutzbank, Esq.*, for the petitioner.
*Michael P. McLeod, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* The Commissioner determined a deficiency in petitioner's income tax for the year 1954 in the amount of $6,500. The only question is whether the amount of $25,000 received in 1954 by the petitioner from the William Morris Agency, Inc. (hereinafter referred to as the Morris Agency), is taxable as capital gain or ordinary income.

All the facts have been stipulated, are so found, and are incorporated herein by reference. Those necessary to an understanding of our inquiry are recited below.

The petitioner, a California corporation, filed its income tax return for the calendar year 1954 with the district director of internal revenue at Los Angeles, California. In Schedule D of the return, it reported a long-term capital gain of $25,000 resulting from the sale of a contract acquired on August 6, 1953.

The Commissioner, among other adjustments made in determining the deficiency, added to the taxable income as disclosed by the return, ordinary income of $25,000 and eliminated that same amount as long-term capital gain. He explained those adjustments as follows:

It is held that there was no sale or exchange of a capital asset as defined in section 1221 of the Internal Revenue Code of 1954. It is further held that the amount of $25,000 is taxable as ordinary income in accordance with section 61(a) of the Internal Revenue Code of 1954.

Petitioner corporation was at all times relevant hereto engaged in the business of representing persons within the entertainment industry as an "artists' representative." It was duly franchised by the various

guilds and unions connected with the entertainment industry, including the Screen Actors' Guild, Inc. (hereinafter referred to as SAG). It employed numerous employees who acted on its behalf in the performance of the aforesaid service.

On August 6, 1953, the petitioner and Edmund Purdom (hereinafter referred to as Purdom) entered into a contract whereby the petitioner was employed to act as Purdom's agent in the motion-picture industry. The contract was for a term of 3 years and was limited to the motion-picture industry and to contracts of Purdom as an actor in such industry. Purdom agreed to pay the petitioner as commissions a sum equal to 10 percent of all moneys or other consideration received by him under contracts of employment entered into during the term of the agreement or in existence when the contract was entered into on which commissions were not payable to any other agent. The contract provided that Paul Small only shall personally supervise Purdom's business and that in the event of Paul Small's death, disability, retirement, or for any other reason he should cease to be active in the affairs of petitioner, Purdom had the right to terminate the agreement. (Paul Small died prior to September 10, 1954.) The petitioner was entitled to the 10 percent after the expiration of the contract so long as Purdom continued to receive moneys or other consideration under employment contracts entered into by him during the term of the contract or during the period such employment contract was extended by the exercise of options. The contract also provided:

So long as the agent receives commissions from the Actor the Agent shall be obligated to service the Actor and perform the obligations of this contract with respect to the services of the Actor on which such commissions are based, * * *

The petitioner was given the right to represent other persons connected with the motion-picture or entertainment industries, and until prohibited by Purdom, petitioner was given the right to make known the fact that it was the sole and exclusive representative of Purdom in the motion-picture industry. Purdom, on the other hand, was given the right at any time to prohibit the petitioner from rendering further services for him or from holding itself out as his agent. This right, however, did not apply to petitioner's right to commissions. The contract was subject to SAG regulations, which regulations provide, in part, that an agent may assign an agency contract to another franchised agent provided the written consent of the actor is obtained.

The petitioner and Purdom entered into a somewhat similar contract on August 6, 1953, providing for the employment of petitioner for a term of 3 years as Purdom's sole and exclusive agent in the radio-broadcasting industry. The contract expressly provided that Purdom would not employ any other person to act for him in a like capacity.

The petitioner, however, was allowed to represent other persons and was not required to devote his entire time and attention to the business of Purdom. In addition, petitioner was given the unqualified right to make known the fact that it was the sole and exclusive representative of Purdom in the broadcasting industry. The contract provided further that three persons named, and those only, should personally supervise Purdom's business during the term of the contract but unnamed employees of the petitioner might handle agency matters for Purdom or aid any of the named persons. The contract was subject to American Federation of Radio Artists regulations governing agents.

Under date of August 6, 1953, Purdom and petitioner executed a third exclusive agency contract providing for the latter's employment as Purdom's sole and exclusive agent in the variety field. The contract was for a term of 3 years and contained provisions similar to those in the previously discussed contracts. The contract did not designate any individual employee of petitioner as the one personally responsible for the supervision of Purdom's affairs. The contract was subject to American Guild of Variety Artists regulations.

The petitioner and Purdom entered into still another contract on August 6, 1953, providing that the petitioner would act for a period of 3 years as Purdom's exclusive agent, representative, manager, and adviser in the field of television. The contract gave the petitioner the right to render similar services to other persons and specifically prohibited Purdom from employing any other person to act for him in the capacity or in the field for which he engaged petitioner. The petitioner was given the right to appoint any agent, representative, associate, or manager outside of the United States and Canada to assist or represent it in the performance of its services under the contract. This contract did not designate any individual employee of petitioner as the one personally responsible for the supervision of Purdom's affairs. The contract also contained other provisions similar to those in the previously mentioned contracts.

After the execution of these contracts and through the efforts of petitioner pursuant to his authority under the SAG contract, Purdom entered into an employment contract with Loew's, Incorporated (hereinafter referred to as Loew's), under which Purdom agreed to render his services exclusively for Loew's. The agreement provided for the payment to Purdom for his services at the rate of $1,000 per week, payable each week during which Purdom actually rendered services, or a minimum of 40 weeks per year.

The term of employment was to commence on March 18, 1954, and was to continue for a period of 1 year. Loew's, however, was given options to extend the agreement for another period of 1 year at the

end of each of 7 years by increasing Purdom's compensation each year by $250 per week.

During the period from March 18, 1954, through August 15, 1954, petitioner received from Purdom an amount equal to 10 percent of all moneys paid by Loew's to Purdom and reported all such receipts on its Federal income tax return for the appropriate period as ordinary income.

The Morris Agency was a corporation engaged in the same type of business as that in which the petitioner was engaged. On July 20, 1954, Purdom entered into a contract with the Morris Agency whereby Purdom employed the latter firm as his agent in theatrical motion pictures. Under the provisions of the contract Purdom agreed to pay the Morris Agency 10 percent of all moneys or other consideration received under contracts of employment entered into during the term of the contract or in existence when the contract was entered into except to the extent that Purdom was obligated to pay commissions under an existing contract to another agent. The contract contained other provisions similar to those already mentioned in connection with the SAG contract between the petitioner and Purdom.

On September 10, 1954, the petitioner and the Morris Agency executed an agreement whereby the petitioner agreed, in part, to "assign, transfer and set over unto Morris" all of its "right, title and interest" in the four agency contracts to which Purdom and the petitioner were parties, "with the same force and effect as though said agency contracts had been entered into between Purdom and Morris, including, but not limited to, the commissions payable to Small pursuant to said agency contracts from and after August 16, 1954." The Morris Agency agreed, in return, to pay to petitioner the sum of $25,000, and petitioner released Morris from all claims and demands whatsoever connected with the *"termination* of the agency relationship between Purdom and Small and the assumption of such agency relationship with Purdom by Morris." (Emphasis supplied.)

In connection with this assignment and attached to it, Purdom executed a document consenting to its terms. In this consent Purdom waived any right he may have to terminate the SAG contract because of Paul Small's death. He also consented that other names (presumably of persons employed by Morris) be substituted for Small's name in the SAG contract and for the names originally contained in the radiobroadcasting agreement with the petitioner. The consent also recited that Purdom had "heretofore entered into certain written agency contracts with Morris and agrees that said agreements shall remain in full force and effect notwithstanding the assignment by Small to Morris of the agency contracts." This consent was also approved by SAG and the labor commissioner of the State of California.

Subsequent to August 16, 1954, the Morris Agency received the sum of $5,676.33 in fees based upon the compensation received by Purdom as a result of the Loew's agreement. This sum would have been paid to petitioner if petitioner and the Morris Agency had not entered into the agreement of September 10, 1954, and represented 10 percent of all amounts received by Purdom from Loew's.

The petitioner contends that the assignment of its agency contracts with the actor Edmund Purdom to the Morris Agency constituted a sale or exchange of capital assets within the meaning of section 1222(3) of the Internal Revenue Code of 1954. As an alternative position, petitioner contends that of the $25,000 paid to it only those amounts representing commissions on contracts obtained for Purdom by the petitioner which were paid to the Morris Agency are taxable as ordinary income. The respondent takes the position that the agency "agreements were for the personal services of the petitioner and were therefore not such assets as could be the subject of a sale." In addition, respondent contends that there was not, in fact, a sale of the agency agreements, but that what took place was merely the release by petitioner of its right under such contracts.

The courts have many times been called upon to decide whether transactions involving the transfer, assignment, cancellation, or relinquishment of contract rights result in ordinary income or capital gain, and we recognize that "rather fine distinctions" have been drawn in the cases which may not be "wholly satisfying." *Marc D. Leh*, 27 T.C. 892, 898, affd. 260 F. 2d 489 (C.A. 9).

Nevertheless, our consideration and study of the facts in the record before us lead us to conclude that this case should be governed by *General Artists Corporation*, 17 T.C. 1517, affd. 205 F. 2d 360 (C.A. 2). In *General Artists*, agency contracts very similar to those in the instant case were involved, and we held that an agreement pursuant to which petitioner purported to sell its agency contracts resulted in ordinary income. Though there are factual differences between the two cases, we think the differences are without significance. In substance, what was accomplished in each case was the substitution of one agent for another, and we do not think that the form of the transaction, i.e., whether the old contracts were to be canceled and new ones entered into, or whether the new agent simply stepped into the shoes of the old with the artist's consent, should lead to a result here different from that reached in *General Artists*. Here there was simply a termination of the relationship previously existing between the petitioner and Purdom and the creation of a similar but new relationship between Morris and Purdom in most respects except as to the motion-picture contract. In the motion-picture field Purdom had exclusive agency contracts both with the petitioner and Morris and

the effect of the September 10, 1954, assignment was to resolve the conflicting obligations arising under those contracts. The net effect of the September 10, 1954, agreements, in our opinion, did not amount to a sale or exchange of a capital asset.

The petitioner has failed to show that the Commissioner erred in taxing the $25,000 to the petitioner as ordinary income.

Reviewed by the Court.

*Decision will be entered for the respondent.*

FISHER, *J.*, concurs in the result.

———

FAY, *J.*, dissenting: I respectfully disagree with the majority opinion of the Court that this case should be governed by *General Artists Corporation, supra*. While the agency contracts in *General Artists* were similar to those in the instant case, nevertheless, the agreements in the respective cases providing for the sale or assignment of these agency contracts were of sufficient dissimilarity to warrant here a result different from that reached in *General Artists*. In the latter case the taxpayer (the original agent) purportedly entered into an agreement with another agent to sell its agency contracts with Frank Sinatra. The agreement expressly provided that the purchaser was to enter into new contracts with Sinatra and that these contracts were to supersede and cancel the taxpayer's contracts with Sinatra. The purchaser agreed to pay the taxpayer 50 percent of the compensation due from Sinatra under the new contracts for the next 5 years and 25 percent on renewals or extensions beyond that date. In holding that no sale or exchange had taken place within the meaning of section 117 of the 1939 Code we stated, "The effect of the agreement was not to sell anything but to permit MCA and Sinatra to enter into new contracts under which MCA would be the exclusive agent of Sinatra instead of the petitioner." In the instant case the contract between the petitioner and the Morris Agency specifically provided that petitioner "assign, transfer and set over unto" the Morris Agency as of August 16, 1954, all of Small's "right, title and interest" in and to said agency contracts. The contract did not provide, as did the contract in *General Artists*, that the purchaser was to enter into new contracts with the artist and that the new contracts would cancel the original agency agreements.

The majority opinion indicates that since what was accomplished in each case was merely the substitution of one agent for another, the difference in the "form of the transaction" should not lead to a different result. The majority seems to overlook the fact that the question before us is whether or not a sale or exchange has taken place. The fact that several means may produce the same end does not necessarily

mean that the means are all the same. For example, a corporation may obtain money from its stockholders by either a loan or a contribution to capital. No court has yet seen fit to hold that all such advances, regardless of form, are either loans or contributions to capital because the end result is the same. To the contrary, each case must be decided on its own peculiar facts. *Gooding Amusement Co.*, 23 T.C. 408, 418, affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957). This principle is equally applicable to this proceeding.

Here, the petitioner and the Morris Agency entered into an agreement whereby the Morris Agency acquired rights from the petitioner which it did not previously possess. These rights, with the exception of the motion-picture contract, were acquired from the petitioner and not from Purdom. On the other hand, in *General Artists* the taxpayer relinquished its rights under the agency contracts and MCA acquired its rights from the actor under a separate contract. The Second Circuit, in affirming our finding in the *General Artists* case, specifically referred to the fact that the transaction involved not an assignment of rights but a release or surrender to the obligor of a negative covenant in order to allow a new covenant to be made with the third party. *General Artists Corporation* v. *Commissioner*, 205 F. 2d 360 (C.A. 2, 1953). For this reason I do not believe that the *General Artists* case is controlling here.

Furthermore, I am of the opinion that the cases in which the grantor or licensor pays the grantee or licensee in order to effect the termination of the jural relationship between the parties are also distinguishable on their facts. See and compare *Commissioner* v. *Starr Bros.*, 204 F. 2d 673 (C.A. 2, 1953); *Leh* v. *Commissioner*, 260 F. 2d 489 (C.A. 9, 1958); *Commissioner* v. *Pittston Company*, 252 F. 2d 344 (C.A. 2, 1958). In these cases, as in *General Artists*, the contract rights either by implication or by expression were not transferred but were released and merely vanished.

The record in the instant case establishes that the rights possessed by the petitioner were transferred to the Morris Agency. The rights did not vanish but were delivered to another in return for the payment of a substantial sum of money. Such circumstances are the foundations upon which sales are built.

Finally, while the majority did not expressly indicate its feelings with regard to whether the rights transferred were capital assets, I feel that the question should be resolved. To this end it is my opinion that the exclusive right to represent a public figure is a valuable property right and, under the circumstances of this case, a capital asset. Cf. *Commissioner* v. *Goff*, 212 F. 2d 875 (C.A. 3, 1954); *Aircraft Mechanics, Inc.*, 30 T.C. 1227 (1958).

It is my opinion, however, that not all of the money received by the petitioner represents sums received for the sale or exchange of a capital asset. I agree with the majority that insofar as the motion-picture contract is concerned no sale or exchange was effected. This is by reason of the fact that the Morris Agency was already possessed of the right to represent Purdom in the motion-picture industry and, hence, did not acquire new rights from the petitioner with respect to this phase of Purdom's theatrical activities. While the record is unsatisfactory as to the amount actually paid for each contract, under the principle announced in *Cohan* v. *Commissioner*, 37 F. 2d 540 (C.A. 2, 1930), I would allocate the sum of $5,000 to this contract and hold that such sum was received by petitioner for a cancellation of its rights under the aforementioned contract. Furthermore, since the petitioner would have received $5,676.33 as commissions on sums earned by Purdom under the Loew's contract had it not assigned its contracts to the Morris Agency, I would hold that this much of the amount received by petitioner should also be taxed as ordinary income.

OPPER and TRAIN, *JJ.*, agree with this dissent.