KING BROADCASTING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1237–66.   Filed July 12, 1967.

*Robert S. Ivie*, for the petitioner.
*Lee A. Kamp*, for the respondent.

#### OPINION

FAY, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1962 in the amount of $69,336.67.

Certain issues raised in the pleadings have been disposed of by agreement of the parties prior to the trial herein. The sole issue left for decision is whether $67,800 realized by petitioner upon the assignment of Muzak subscribed contracts which were separately bargained for on the sale and assignment of assets to two separate purchasers is taxable as capital gains under section 1221 of the Internal Revenue Code of 1954 or ordinary income under section 61 of the same Code.

All of the facts were stipulated and the stipulated facts and ex hibits attached thereto are so found.

Petitioner King Broadcasting Co. (hereinafter referred to as King), a corporation with its office and principal place of business in Seattle, Wash., filed its Federal corporate income tax return for the calendar year 1962 with the district director of internal revenue, Tacoma, Wash.

Musiking, Inc. (hereinafter referred to as Musiking), was organized under the laws of the State of Washington on January 29, 1959. King subscribed for, and purchased, all of the outstanding Musiking stock at a cost of $50,000.

Prior to February 2, 1959, Melody Co., Inc. (hereinafter referred to as Melody), held an exclusive franchise from Muzak Corp., New York, N.Y. (hereinafter referred to as Muzak), covering transmission of Muzak music and programs to customers and subscribers in five counties located in the State of Washington. On February 2,

1959, Musiking contracted to purchase the assets of Melody. The agreement between Melody and Musiking provided for a purchase price of $145,000 with the tangible personal property valued at $64,045.92. None of the other assets obtained from Melody were separately bargained for. Tangible personal property owned by seller listed in schedule A and subscriber contracts listed in schedule B which were attached to the contract were the only rights specifically enumerated as being purchased by Musiking. Musiking did not obtain Melody's cash and accounts receivable. Article 11 of the sales contract between Musiking and Melody provided, *inter alia:*

11. Seller waives all rights which it has under its franchise agreement with the Muzak Corporation and consents to the formation of a franchise agreement between Buyer and the Muzak Corporation covering a territory which includes Seller's present territory; and Seller agrees to sign, when it is later presented to Seller, an assignment which is to be prepared by the Muzak Corporation assigning to Buyer Seller's interest in its Muzak franchise agreement, and Seller further agrees to execute all other papers and documents which are necessary fully to assign the Muzak franchise agreement to Buyer. * * *

On February 2, 1959, an agreement was entered into between Muzak (licensor), Melody (licensee), and Musiking (assignee) which, *inter alia*, provided as follows:

WHEREAS, there is now in full force and effect between Licensor and Licensee a certain binding Muzak Franchise Agreement dated November 20, 1945 and amendments thereto (said Agreement and amendments being hereinafter called the "Franchise Agreement") ; and

WHEREAS, Licensee and Assignee represent to Licensor that effective as of the date hereof all of the customer and subscriber accounts and equipment acquired by Licensee in the operation of its business pursuant to said Franchise Agreement have been duly sold, transferred and assigned to Assignee ; and

WHEREAS, Licensee and Assignee desire that the Franchise Agreement be assigned to Assignee, and Assignee has requested Licensor to modify and amend the Franchise Agreement ; and

WHEREAS, Licensor is willing to consent to the assignment of the Franchise Agreement and modify and amend the same subject to the terms and conditions hereinafter set forth :

Now, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereto agree as follows :

1. Effective as of the date hereof Licensee hereby assigns said Franchise Agreement to Assignee and Assignee hereby accepts such assignment and agrees to be bound by and fully comply with all of the terms, conditions and provisions of said Franchise Agreement.

2. In reliance upon the representations and warranties of Licensee and Assignee that Assignee is the owner of all of the customer and subscriber accounts and equipment acquired by Licensee in the operation of its business pursuant to the Franchise Agreement, Licensor hereby consents and agrees to the foregoing assignment of the Franchise Agreement from Licensee to Assignee. All of said customer and subscriber accounts and equipment are subject to all of the terms, conditions and provisions of the Franchise Agreement.

\*      \*      \*      \*      \*      \*      \*

7. The term of the Franchise Agreement is hereby extended to expire on December 31, 1969. Provided the Franchise Agreement is in full force and effect, Assignee may extend the term thereof for an additional period of ten (10) years beginning January 1, 1970 and ending December 31, 1979 provided Assignee notifies Licensor in writing to such effect not later than December 31, 1968.

8. All of the terms, conditions, provisions and restrictions of the Franchise Agreement, as modified and amended herein, are hereby ratified, approved and confirmed.

After purchasing the Melody assets, Musiking assigned $64,045.92 to the tangible personal property and then assigned the balance of the $145,000, namely $80,954.08, to the Muzak franchise and noncompetition agreement received from Melody. Apparently, Musiking never broke down the $80,954.08 into separate values for the Muzak franchise and the noncompetition agreement. In the amortization schedule attached to its Federal tax returns, Musiking merely listed as the cost of both intangible assets the amount of $80,954.08, and then indicated that this sum was amortizable over 131 months. Musiking did not assign any value to the current executory subscriber contracts received from Melody.

On November 1, 1961, Musiking was merged into King with King being the successor corporation.

On December 29, 1961, King entered into a contract (hereinafter referred to as the Irvine contract) whereby it sold the assets of Musiking (except receivables and trade name) to Jack Irvine, d.b.a. Business Music Co., in and for eight counties located in the State of Washington. On December 29, 1961, King entered into a contract (hereinafter referred to as the C & G contract) whereby it sold the assets of Musiking (except receivables and trade name) to C & G Electronics Co., a Washington corporation, in and for seven counties located in the State of Washington.

The total allocation made by the parties in the two sales contracts was as follows:

Tangible personal property _____ $97, 500
Unexpired portion of executory Muzak Program Service
  Agreements _____ 67, 800
  
  Total purchase price _____ 165, 300

In addition, the parties allocated $7,500 to the covenants not to compete.

In (a) the sales contract between King and Irvine and in (b) the sales contract between King and C & G Electronics Co., there was included the following provisions:

(11) This contract is expressly subject to the following * * * conditions:

    *       *       *       *       *       *       *

(b) A contract or contracts in form satisfactory to Seller, in its sole and complete discretion, must be entered into by Muzak Corporation, pursuant to

which Muzak cancels the existing franchise running to Seller and grants a new franchise to Purchaser subject to the cancellation and assignment provisions of paragraph (9) of this Agreement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

If any of the said \* \* \* conditions shall not be met on or before January 31, 1962, this Contract of Sale shall be null and void for all purposes.

Paragraph (9) of the contracts provided:

(9) In the event the Purchaser shall become in default under this Agreement and in the event Seller shall commence an action to foreclose either of the said chattel mortgages, Purchaser agrees that immediately upon commencement of such action the franchise agreement from Muzak Corporation to Purchaser shall be cancelled immediately and *automatically assigned to Seller* by virtue of these presents and without the necessity of any formal written assignment or written confirmation by Purchaser of any nature. *The parties recognize the fact that the security represented by the said Chattel Mortgages is of little or no value unless Seller can obtain an immediate assignment of the said franchise, without delay or interference.* \* \* \*

[Emphasis supplied.]

With respect to the above sales, the exclusive Muzak franchise could have been assigned by King, with the consent of Muzak, but it was determined by counsel that the existing franchise should be canceled and that two separate new franchises should be issued by Muzak, in view of the fact that two separate purchasers were involved.

On January 31, 1962, pursuant to article (11)(b) of the Irvine and C & G contracts, King entered into an agreement with Muzak which, in pertinent part, states as follows:

WHEREAS, there is now in full force and effect between Licensor [Muzak] and Licensee [King] a certain binding Muzak Franchise Agreement dated November 20, 1945 and amendments thereto (said Agreement and amendments being hereinafter called the "Franchise Agreement") ; \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

WHEREAS, Licensee represents to Licensor that it has agreed to sell all of the customer and subscriber accounts and equipment acquired by it in the operation of its business as a Muzak Franchise holder pursuant to said Franchise Agreement to John W. Irvine individually, and doing business as Business Music Company, 6634 White-Henry-Stuart Building, Seattle 1, Washington (hereinafter called "Irvine") and C & G ELECTRONICS CO., a corporation of the State of Washington, 2502 Jefferson Avenue, Tacoma, Washington, (hereinafter called "C & G") ; and

WHEREAS, Licensee has requested Licensor to terminate and cancel said Franchise Agreement and enter into separate franchise contracts with Irvine and C & G and Licensor is willing to do so upon the terms and conditions hereinafter set forth.

Now, THEREFORE, in consideration of the premises and the mutual convenants and agreements hereinafter contained, the parties hereto agree as follows:

1. Subject to

(a) the transfer and sale from Licensee to Irvine and C & G of all of the customer and subscriber accounts and equipment acquired by Licensee in the operation of its business as a Muzak Franchise holder pursuant to the Franchise Agreement; and

(b) the execution of a Muzak Standard Franchise Contract between Licensor and Irvine in which the territory is specified as: Whatcom, San Juan, Skagit, Island, Chelan, Snohomish, King and Kittitas Counties in the State of Washington; and

(c) the execution of a Muzak Standard Franchise Contract between Licensor and C & G in which the territory is specified as: Clallum, Jefferson, Mason, Kitsap, Pierce, Thurston and Lewis Counties in the State of Washington, it is hereby agreed by and between Licensor and Licensee that said Franchise Agreement is fully terminated and cancelled effective as of January 31, 1962. It is specifically understood and agreed that all obligations and responsibilities of Licensee under said Franchise Agreement arising by virtue of anything done or which occurred prior to February 1, 1962 shall survive and remain in full force and effect until all such obligations and responsibilities have been fully performed and complied with by Licensee.

\*       \*       \*       \*       \*       \*       \*

4. In the event of

(a) a default by Irvine under the terms and conditions of the Muzak Standard Franchise Contract to be entered into between Licensor and Irvine, or

(b) a default by C & G under the terms and conditions of the Muzak Standard Franchise Contract to be entered into between Licensor and C & G, and

(c) in the event such default occurs prior to February 1, 1967 and Licensor, as a result of such default, terminates the Muzak Standard Franchise Contract between Licensor and Irvine or the Muzak Standard Franchise Contract between Licensor and C & G, or

(d) in the event of cancellation or termination of either of said franchises prior to February 1, 1967, for any other reason (other than default described in Paragraph 5 of this agreement),

Licensor shall notify Licensee in writing of such default and termination. Licensee shall thereupon advise Licensor in writing within ten (10) days thereafter of its desire to enter into a Muzak Franchise Agreement for the territory specified in the Muzak Standard Franchise Contract which has been terminated or cancelled as aforesaid. If Licensee notifies Licensor that it desires a Muzak franchise for said area, Licensor and Licensee shall promptly enter into a Muzak Franchise Agreement, on the same terms and conditions as the franchise agreement which has been terminated or cancelled, and Licensee shall commence operations pursuant thereto forthwith. \* \* \*

\*       \*       \*       \*       \*       \*       \*

6. Nothing in this agreement shall prohibit, restrict or restrain Licensor from amending, modifying or changing the terms and conditions of its Muzak Standard Franchise Contracts with Irvine and with C & G, but Licensor agrees to notify Licensee in writing of any such changes which occur prior to February 1, 1967; provided that no such amendment, modification or change shall alter Licensee's rights under Paragraphs 4. and 5. hereof.

In its Federal corporate income tax return for the calendar year 1962, King showed a net gain of $57,410.35, resulting from the sale of Musiking assets and allocated $49,910.35 to long-term capital gain and $7,500 to ordinary income. Electing to report on the installment basis, King reported on its return $12,179.87 long-term capital gain and $1,830.14 ordinary income.

In his notice of deficiency, respondent asserted that the gain is taxable as ordinary income and, accordingly, King's ordinary income on the installment basis is increased by $1,300.32.

The sole issue for decision requires us to determine the tax treatment to be applied to the amount of $67,800. Petitioner proffers two separate theories which, it contends, suggest capital gains tax treatment of that sum. Petitioner first argues that the Muzak Program Service Agreements were capital assets as defined in section 1221. Petitioner takes the alternative position that the $67,800 portion of the purchase price should be regarded as an amount which it received in consideration for the transfer of the exclusive Muzak franchise to the purchasers.

We will first deal with petitioner's alternative argument. In support of its alternative position, petitioner contends that the parties to the sale, including itself, took a superficial view of said transaction in concluding that no sale of the Muzak franchise to Irvine and C & G Electronics Co. actually transpired merely because petitioner and Muzak went through the form of a "cancellation" of the franchise. The franchise held by King was "canceled" or released instead of assigned to Irvine and C & G Electronics Co. because two separate purchasers were involved, and it was determined by counsel that new separate franchises should be issued by Muzak. The exclusive Muzak franchise was clearly an essential asset of Musiking's business. Both the Irvine and the C & G sales contracts were expressly conditioned upon the granting and receipt of new Muzak franchises. In the agreement between Muzak and petitioner dated January 31, 1962, petitioner's Muzak franchise was terminated and canceled upon the condition that standard franchises be entered into between Muzak and Irvine and C & G Electronics Co. Moreover, despite cancellation and termination of petitioner's franchise, petitioner was given the right, both in the Irvine and C & G contracts and in the January 31, 1962, agreement with Muzak, to take over the separate franchises issued to Irvine and C & G Electronics Co. in the event of default by the purchasers.

Consideration of *Commissioner* v. *Ferrer*, 304 F. 2d 125 (C.A. 2, 1962), modifying 35 T.C. 617 (1961), is relevant at this juncture. The facts in that case may be summarized as follows: In 1951, Ferrer obtained the exclusive dramatic production rights to a play based on a novel written by one Pierre LaMure (the author). The contract specified that LaMure reserved full legal and equitable title to the property, and Ferrer was granted merely a "lease" of the exclusive theatrical production rights. In addition to his "leasehold" interest, Ferrer was given the power to prevent the author's transfer of the retained film rights in the property until the play had been running for a specified period of time. If Ferrer consented to such a transfer by the author, he was entitled to share in any proceeds realized by the author

therefrom. As interpreted by the Second Circuit, Ferrer's bundle of "rights" under this contract consisted of (1) his lease of the play, (2) his "encumbrance," or restriction of the author's power to transfer the retained film rights, and (3) a contingent royalty interest in the consideration received by the author if the film rights were sold with Ferrer's consent. In 1952, before the play could be produced, a motion picture company (Moulin) purchased the film and television rights from the author and simultaneously obtained a "release" of Ferrer's above rights in the property. Ferrer was also hired to act in the film. For his services as an actor, Ferrer was to receive a specified salary (part of which was fixed and part of which was contingent on profits from the film). For his release of his rights in the play, Ferrer was granted a 17-percent interest in the net profits of the film. It was this latter figure which was at issue in the case. The Government contended that the "release" by Ferrer did not constitute a "sale or exchange" and that, accordingly, the proceeds of the transaction realized by Ferrer were not to be taxed at capital gains rates. (Similarly, respondent herein argues that King did not sell the Muzak franchise either to Irvine or C & G Electronics Co.)

The Second Circuit in *Ferrer*, stated:

In the instant case we can see no sensible business basis for drawing a line between a release of Ferrer's rights to LaMure for a consideration paid by Moulin, and a sale of them, with LaMure's consent, to Moulin or to a stranger who would then release them. * * * Tax law is concerned with the substance, here the voluntary passing of "property" rights allegedly constituting "capital assets," not with whether they are passed to a stranger or to a person already having a larger "estate." * * * [304 F. 2d at 131]

Thus, the Second Circuit refused to be concerned with the form in which the parties cast the particular transfer, i.e., whether Ferrer had "sold" his rights to Moulin who had in turn released them to the author, or, instead, whether Ferrer had "released" them directly to the author for a consideration paid by Moulin as did, in fact, occur. In either case, the court held that the sum effect of the transaction constituted a "sale" for capital gains purposes.

If we agreed with the Second Circuit's characterization of the "cancellation" transaction in *Ferrer* and applied its reasoning herein, we believe that the transaction here might possibly be construed as involving a "sale or exchange" of the Muzak franchise to Irvine and C & G Electronics Co. The "Achilles' heel" of petitioner's alternative argument, however, lies in the unalterable fact that, in the Irvine and C & G contracts, the parties allocated the total sum of $67,800 to the program service agreements. The remainder of the sales price in both contracts was allocated to other assets. Nothing was allocated to the Muzak franchise. Moreover, there are no other factors in the

record which tend to show that King intended to sell, and Irvine and C & G Electronics Co. intended to buy, the Muzak franchise. In *Ferrer*, it was clear that Ferrer sold for consideration received his rights under his contract with LaMure. We cannot reallocate the $67,800 or any portion thereof to the Muzak franchise out of solicitude for what may have been petitioner's errors in negotiating the Irvine and C & G contracts.

Petitioner urges us to reallocate the $67,800 to the franchise on the ground that there was a sale of the Muzak franchise, as the underlying asset and primary income-producing asset of the business, carrying with it the program service agreements which were tied in and connected with the franchise. Petitioner argues that these items were so intrinsically related that they cannot be separated in connection with the sale. In support of its position, petitioner compares the sales in question to the sale of real property subject to a lease or to leases and relies strongly upon *Metropolitan Building Co.*, 31 T.C. 971 (1959), reversed in part 282 F. 2d 592 (C.A. 9, 1960), for legal buttressing. There, the University of Washington owned real property which it leased to the taxpayer. The taxpayer in turn subleased a portion of the tract to Olympic from whom it was to receive rental. Thereafter, Olympic and the university decided to deal directly with one another. In consideration of a payment of $137,000 from Olympic, the taxpayer surrendered to the university its lease with respect to the portion it subleased to Olympic. The Ninth Circuit held that the $137,000 payment was to be taxed as a capital gain. It stated:

> In the case before us, the sums paid to Metropolitan were not simply a discharge of Olympic's obligation to pay rental. They were paid for the purchase of Metropolitan's entire leasehold interest. The case is not one of a liquidation of a right to future income as is Hort, but rather it is one of a disposition of income-producing property itself. * * * [282 F. 2d at 594]

See also, *Commissioner* v. *Ferrer*, *supra*, wherein the Second Circuit stated:

> We see no basis for holding that amounts paid Ferrer for surrender of his lease of the play are excluded from capital gain treatment because receipts from the play would have been ordinary income. The latter is equally true if a lessee of real property sells or surrenders a lease from which he is receiving business income or subrentals; * * * [304 F. 2d at 132]

Without doubt, the Muzak franchise and the service agreements were related assets; however, we believe petitioner's analogy of the franchise and service agreements to a rental unit subject to a leasehold or leaseholds to be inaccurate. Unlike a rental unit, a franchise is a static, intangible asset unproductive of income *in and of itself*. A franchise, to be productive of income, requires exploitation to the degree to which income is desired. A franchise is a store without inventory; it is the premises in which and from which income-producing transactions may be effectuated.

The program service agreements were the product of Musiking's (and Melody's) exploitation of the Muzak franchise. These agreements had to be serviced, that is—Muzak programs had to be transmitted according to the terms of the program service agreements. The Muzak franchise allows its holder the right to transmit Muzak programs but does not and cannot transmit them itself. This, petitioner or Musiking had to do.

Despite the fact that the production of rental income typically involves on the part of the lessor distinct elements of service, such as maintenance, upkeep, and concierge functions, the rental unit itself is overwhelmingly the major income-producing factor and the personal services are ancillary. Thus, where as a rental unit and a lease must be viewed as a unit, the franchise herein and related service agreements need not be. Therefore, we see no reason to allocate the entire $67,800 or any portion thereof to the franchise on the basis of its relation to the program service agreements, in the absence of a provision in the sales contracts providing for such allocation.

We now reach petitioner's first argument, that is: Whether the program service agreements were capital assets as defined in section 1221.

We do not believe that the program service agreements qualify as capital assets. The line between contractual rights representing capital assets and those representing the right to receive future income is far from clear. However, as Judge Friendly pointed out, in *Commissioner* v. *Ferrer*, *supra*, there are certain distinguishing factors:

> One common characteristic of the group held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in (Golonsky [200 F. 2d 72 (C.A. 3, 1952), certiorari denied 345 U.S. 939 (1953)], McCue [210 F. 2d 752 (C.A. 2, 1954), certiorari denied 348 U.S. 829 (1954)], Metropolitan [*supra*]), or an "encumbrance" on (Ray [210 F. 2d 390 (C.A. 5, 1954), certiorari denied 348 U.S. 829 (1954)]), or an option to acquire an interest in (Dorman [296 F. 2d 27 (C.A. 9, 1961)]), property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another (Starr [204 F. 2d 673 (C.A. 2, 1953)], Leh [260 F. 2d 489 (C.A. 9, 1958)], General Artists [205 F. 2d 360 (C.A. 2, 1953)], Pittston [252 F. 2d 344 (C.A. 2, 1958)]), or by rendering services (Holt [303 F. 2d 687 (C.A. 9, 1962)]), or by virtue of ownership of a larger "estate" (Hort [313 U.S. 28 (1941)], P. G. Lake [356 U.S. 260 (1958)]). * * * [304 F. 2d at 130, 131]

While the Muzak franchise held by King is, in our opinion, in the nature of a capital asset,[1] the service program agreements represent

[1] The Muzak franchise involved herein was not a mere right to perform services and receive compensation in return therefor. Cf. *Paul Small Artists, Ltd.*, 37 T.C. 223 (1961); and *Holt* v. *Commissioner*, 303 F. 2d 687 (C.A. 9, 1962), affirming 35 T.C. 588 (1961). Moreover, we believe that the franchise does give its holders some kind of enforceable estate in the Muzak system and in the substantial goodwill that had been built up in connection with the Muzak name. Cf. *Commissioner* v. *Ferrer*, 304 F. 2d 125, 130–131 (C.A. 2, 1962), modifying 35 T.C. 617 (1961). At the very least, the franchise gave its holders herein the right to exclude others from using the Muzak system in the specified Washington counties. In our opinion, this right was a proprietary right. It is also our opinion that this right constituted a capital asset. See, *Jones* v. *United States*, 96 F. Supp. 973 (D.Colo. 1951), affd. 194 F. 2d 783 (C.A. 10, 1952).

mere contractural opportunities to obtain periodic receipts of income. Essentially, the program service agreements were for the transmission of recorded Muzak programs and, unlike the franchise, cannot be considered an "enforceable estate" or an "encumbrance" or an interest in property. They were mere opportunities afforded by contract, to obtain receipts of income, as consideration for the transmission of prerecorded programs.

We believe that the Fifth Circuit's opinion in *Bisbee-Baldwin Corporation* v. *Tomlinson*, 320 F. 2d 929 (C.A. 5, 1963), provides the basis for decision herein. There, the issue for decision was whether payments received by the taxpayer for termination of mortgage-servicing contracts were taxable as ordinary income or capital gains. The Court of Appeals in that case framed the issue as follows:

The question is, what do the mortgage servicing rights under the contracts represent. If they represent the right to earn future income in the form of commissions for services rendered, then the sum received for the cancellation of the contracts and the transfer of rights is ordinary income. [320 F. 2d at 932]

The Court of Appeals held that the *basic* rights sold by the taxpayer in that case were the annual servicing commissions on the principal balance outstanding on the mortgages. It noted:

Indeed, the termination fee of one per cent of the mortgages serviced by the taxpayer was equivalent to two years gross income in commissions and was, to our minds, a substitute for the income which would have been earned by Bisbee-Baldwin had the contracts not been transferred. [320 F. 2d at 933, 934]

In summary, the Fifth Circuit stated:

Essentially, the contract was a management contract for the employment of personal services. The consideration received for the right to earn future servicing commissions must be regarded as a substitute for such future ordinary income. * * * [320 F. 2d at 935]

The taxpayer vainly sought to distinguish between the right to receive future income and the right to earn future income. The Fifth Circuit held that such distinction found no legal support. Finally, the court held that some part of the "bundle" of the contractual rights transferred by the taxpayer did constitute capital assets. It held that the relationships between the taxpayer and the various mortgage companies whose mortgages it serviced had value *in addition* to the taxpayer's right to commissions on mortgages serviced. The Court of Appeals stated that such relationships act as "feeders" for other business flowing to the taxpayer from the mortgage companies.

We believe that (1) petitioner's right to income arising from the program service agreements is equivalent to the right of the taxpayer in *Bisbee-Baldwin* to commissions on mortgage servicing and (2) the Muzak franchise is equivalent to the relationship between the taxpayer in *Bisbee-Baldwin* and the mortgage companies which relationship was considered therein to constitute a capital asset.

Unlike *Bisbee-Baldwin*, there is no opportunity in the instant case for an allocation of consideration. If $67,800 of the purchase price in the Irvine and C & G contracts had not so explicitly been assigned exclusively to the program service agreements, we would have been able to "fragment" such amount between the franchise and the program service agreements as in *Bisbee-Baldwin*.

Petitioner cites *United States* v. *Dresser Industries, Inc.*, 324 F. 2d 56 (C.A. 5, 1963), which was decided by the Fifth Circuit after their decision in *Bisbee-Baldwin*. The Court of Appeals in that case found capital gains treatment on gain arising from the cancellation of an exclusive patent license contract. Petitioner's reliance on *Dresser Industries* is misplaced. The patent license therein was a property interest while the program service agreements herein, like the basic interests transferred in the *Bisbee-Baldwin* case involved mere contractual rights to obtain receipts of income by dealing with another or by rendering services.

On the basis of the foregoing, we hold that the program service agreements were not capital assets and we therefore hold for respondent on this issue.

Petitioner is not entitled to an abandonment loss under section 167 upon the cancellation of the Muzak franchise. There is no evidence in the record to establish Musiking's or petitioner's bases for the franchise even if Musiking can be said to have purchased the franchise from Melody. Consequently, there is no way to determine what amount petitioner can be said to have "lost" by reason of abandonment.

Petitioner also contends that the unamortized cost of the franchise should be deducted from the sales price of the intangible assets in determining the taxable income from the sales to Irvine and C & G Electronics Co. Once again, we note that the record fails to establish any separate basis for the franchise.

On the basis of the foregoing, we hold for respondent.

*Decision will be entered under Rule 50.*