HENRIETTA B. GOFF, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 34643, 34644, 34645, 34646, 34647. Promulgated May 29, 1953.

---

[1] Proceedings of the following petitioners are consolidated herewith: Rebecca Hirschwald, Docket No. 34644; Thomas V. and Barbara F. Markle, Docket No. 34645; David Rosen, Docket No. 34646; and Julia L. Sanson, Docket No. 34647.

*Herman H. Krekstein, Esq.*, for the petitioners.
*John D. Armstrong, Esq.*, for the respondent.

OPINION.

Murdock, *Judge:* The Commissioner determined deficiencies in income tax for 1947 as follows:

| Doc. No. | Petitioner | Amount |
|---|---|---|
| 34643 | Henrietta B. Goff | $7,705.24 |
| 34644 | Rebecca Hirschwald | 8,259.83 |
| 34645 | Thomas V. and Barbara F. Markle | 20,423.71 |
| 34646 | David Rosen | 1,629.01 |
| 34647 | Julia L. Sanson | 21,826.90 |

The only issue which has not been conceded or settled by stipulation is whether the gain realized by Saxon Hosiery Mills, hereafter called Saxon, a partnership for income tax purposes, from a transaction on June 30, 1946, in which it gave up all of its rights under an agreement dated August 30, 1941, to Artcraft Hosiery Company, hereafter called Artcraft, in exchange for Artcraft's stock, was capital gain or ordinary income. The facts have been presented by a stipulation which is adopted as the findings of fact.

The petitioners filed returns for 1947 with the collector of internal revenue for the first district of Pennsylvania.

The petitioners, with the exception of Barbara F. Markle, entered into a joint venture or partnership under the name of Saxon Hosiery Mills for the purpose of acquiring four hosiery machines and installing them in a manufacturing plant of a third party. Saxon purchased the machines at a cost of $63,591.67 and then delivered them and set them up in the plant of Pickwick Hosiery Mills, hereafter called Pickwick, pursuant to a written agreement between Pickwick and Saxon dated August 30, 1941.

The agreement was in the form of a lease under which Pickwick agreed to pay Saxon rent for the use of the machines of 30 cents per dozen pairs of hose manufactured on the machines. Pickwick was to deliver to Saxon all of the hosiery manufactured on the machines up to December 15, 1946, and was to receive therefor an amount fixed by the contract. Saxon had a right to renew the agreement for five additional years upon the same terms and conditions. Pickwick was to manufacture for Saxon a minimum of 750 dozen pairs of hose per week. Pickwick, if not in default, had the right upon the expiration of the renewal, if any, to purchase the machines for $100 if the rental payments of 30 cents had amounted to $70,000, or for $100 plus the

difference between the $70,000 and the total of the rental payments, if less than $70,000.

Saxon recorded the above transaction on its books as a sale of machinery for $70,100 and reported the gain of $6,508.33 on the installment method. Pickwick recorded the transaction on its books as a purchase of machinery and equipment for $70,100. Saxon never claimed any depreciation on the machinery on its books or returns, but Pickwick accrued depreciation on its books and claimed deductions for depreciation of the machinery on its returns.

The contract was carried out by Pickwick and Saxon in accordance with its terms until June 29, 1944, when Pickwick assigned all of its properties and assets, including its right, title, and interest in the August 30, 1941, contract with Saxon to Artcraft Hosiery Company, hereafter called Artcraft, which agreed to carry out and perform the obligations imposed upon Pickwick under the contract with Saxon. Artcraft entered the machinery on its books as an asset at the net value carried on Pickwick's books of $70,100, less the reserve for depreciation. Artcraft thereafter regularly accrued depreciation on the machinery on its books and claimed deductions therefor on its tax returns. Artcraft bought back from Saxon at an advance in price most of the hosiery manufactured under the agreement.

Saxon and Artcraft continued to carry out the agreement in accordance with its terms until June 30, 1946.

The 30 cents per dozen pairs received by Saxon from Pickwick and Artcraft were credited on Saxon's books to the account receivable due from those corporations. The payers debited those amounts on their books to the account payable to Saxon. Total payments of $50,474.07 were thus received by Saxon from Pickwick and Artcraft, leaving a balance of $19,625.93 due from Artcraft to Saxon on June 30, 1946.

Artcraft and Saxon entered into a written agreement dated June 30, 1946, entitled "Agreement of Sale" reciting that Saxon was the owner of the four machines leased to Artcraft, Saxon was entitled to all of the production from the machines at the price fixed in the agreement, and Artcraft desired to purchase and Saxon desired to sell all of the right, title, and interest of Saxon in the machines and the accompanying production agreement at a price and upon terms agreed upon. Artcraft agreed to buy and Saxon agreed to sell all of Saxon's right, title, and interest in the four machines and in the agreement under which Saxon was entitled to the production from the machines, for which Artcraft agreed to pay Saxon $250,000 by the transfer to Saxon of 2,150 shares of Artcraft's $5 par value common stock at a valuation of $66 a share and 1,081 shares of Artcraft's $100 par value voting preferred stock at a valuation of $100 per share. Saxon agreed to execute bills of sale, assignments, and

other documents that might be necessary to convey clear title to the assets free of encumbrances to Artcraft. Saxon agreed that it was the sole owner of the assets sold and transferred and they were free of encumbrances.

The agreement of June 30, 1946, was carried out in accordance with its terms at or about the date of its execution.

The total fair market value of the 2,150 shares of common and the 1,081 shares of preferred stock of Artcraft transferred to Saxon was $161,850 at the time of the transfer.

Saxon, treating the value of the stock as $150,409.85, debited a stock account with that amount, credited $19,625.93 to the account receivable from Artcraft, and credited $130,783.92 to an account entitled "profit on sale of machinery account." The account showing the installment sale of machinery was closed out to profit and loss and reported as income on Saxon's return for its fiscal year ended February 28, 1947, for which it also reported a long-term capital gain of $130,783.92 from the transaction. The petitioners reported their proportionate shares of that long-term capital gain on their returns for 1947.

The parties have stipulated that the gain derived by Saxon from the transaction with Artcraft on June 30, 1946, was $142,224.07 and that gain was realized during Saxon's taxable year ended February 28, 1947.

The Commissioner, in determining the deficiencies, eliminated the capital gain reported by each petitioner and included his proportionate share of Saxon's gain of $142,224.07 as ordinary income.

The Commissioner argues that the contract of August 30, 1941, resulted in a sale of the machines by Saxon and was not a lease. The petitioners agree that the machines were sold at some time and it is not necessary to decide whether the sale took place prior to June 30, 1946. The parties agree that $19,625.93 of the value of the Artcraft stock received by Saxon went to complete the payments for the four machines and was properly reported, on the partnership return and by the individual petitioners, on the installment sales method. The difference between that amount and the total value of the shares was a stipulated gain of Saxon and their stipulation must mean and their arguments indicate that it was a gain relating solely to the disposition of Saxon's rights to the production from the machines, which rights apparently had no basis for gain or loss, so that the entire amount received is stipulated as gain.

The Commissioner does not dispute that the rights of Saxon, under the contract of August 30, 1941, to have the four machines used exclusively until December 15, 1951, to produce at least 750 pairs per week for it at prices fixed by the agreement, was a capital asset of

Saxon held by it for more than 6 months. His whole argument is that section 117 (a) (4) does not apply because there was no sale or exchange of that asset to Artcraft since Artcraft acquired no property under the agreement of June 30, 1946, but merely had an obligation extinguished. Thus, the ultimate question is whether Artcraft acquired any property under the provisions of the contract of June 30, 1946, which terminated the production provisions of the contract of August 30, 1941.

The petitioners concede that there would have been merely a payment of income if Saxon's rights in regard to production under the contract of August 30, 1941, had consisted solely of the right to receive money which would be income as received. They contend, however, that Saxon retained some interest in the machines under the production provisions of the August 30, 1941, contract, regardless of when the four machines were sold; that was the right to have the machines used exclusively until December 15, 1951, to produce at least a minimum of 750 pairs of hose per week at the price fixed; Artcraft acquired for the first time by the agreement of June 30, 1946, the right to dispose of or use the four machines as it might choose during the next 5 years, 5½ months; and a property right was thus transferred from Saxon and received and retained by Artcraft by a sale or exchange within the meaning of section 117 (a) (4). That argument is sound. Artcraft received by sale or exchange under the transactions of June 30, 1946, a valuable property right in the machines which it otherwise would not have had as the owner of the machines and for which it paid $142,224.07. Saxon's gain, or $142,224.07, was a long-term capital gain. *Isadore Golonsky*, 16 T. C. 1450, affd. 200 F. 2d 72, certiorari denied 345 U. S. 939; *McCue Bros. & Drummond, Inc.*, 19 T. C. 667; *Louis W. Ray*, 18 T. C. 438; *Jones v. Corbyn*, 186 F. 2d 450; *Elliott B. Smoak*, 43 B. T. A. 907; and *Starr Brothers, Inc.*, 18 T. C. 149.

*Decisions will be entered under Rule 50.*