JAMES A. SKANNEL, PETITIONER, *v.* COMMISIONER OF INTERNAL REVENUE, RESPONDENT

ARRON BENTON AND HELEN BENTON, PETITIONRS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONENT.

Docket Nos. 56573, 56630. Filed March 18, 1957.

*Morris Katz, Esq.,* for the petitioners.
*Charles B. Markham, Esq.,* for the respondent.

OPINION.

RAUM, *Judge:* The Commissioner determined deficiencies in income tax for 1951 against petitioners as follows:

| | |
|---|---|
| James A. Skannel | $5, 648. 82 |
| Arron and Helen Benton | 4, 163. 48 |

The question for decision is whether the payment of $17,500 to Skannel and Arron Benton in connection with their relinquishment of rights under a distributorship agreement represents ordinary income or capital gain. Helen Benton is involved as a petitioner only because of the filing of a joint return with her husband, Arron. The facts have been stipulated.

On December 13, 1949, Skannel and Benton entered into a written agreement with General Bronze Corporation whereby it appointed them as its exclusive distributor of its Alwintite combination storm window, sash, and screen, in the States of New York, New Jersey, and Pennsylvania. They undertook to purchase 50,000 units in 1950; for future years a quota was to be agreed upon annually. They further agreed to promote the sale of the product vigorously in their territory and not to handle any competing products. The agreement was embodied in a letter from General Bronze addressed to both of them. The record is not clear as to whether Skannel and Benton were operating as a partnership, or whether, in some form or other, they were utilizing a corporation to carry on their business. However, at least by mid-1951 it appears that both of them owned an aggregate of 94 per cent of the stock in a corporation known as Skanton Aluminum Corporation.

On July 26 and 27, 1951, two apparently interrelated events occurred. On July 26, 1951, Skannel and Benton entered into a further agreement with General Bronze, pursuant to which General Bronze paid them $17,500. They, in turn, relinquished the 3 States as their territory and agreed to purchase not less than 15,000 units of the product

"during the balance of 1951." They further agreed that neither they nor Skanton had any "claim to inventorship in connection with storm sash and screen and associated constructions that are incorporated in or related to those embodied in the combination storm sash and screen construction that we delivered to you in August, 1949." Finally, they undertook not to manufacture or sell any product embodying "any of the discoveries or inventions" referred to, "except such [product] * * * as we may sell to you."

On July 27, 1951, General Bronze entered into an agreement with Skannel and Benton acting for Skanton whereby it appointed Skanton as the exclusive distributor of its aluminum storm window and screen in certain counties of New York and New Jersey and all of Connecticut.

In their amended returns for 1951 Skannel and Benton each reported the receipt of one-half of the foregoing sum of $17,500 as long-term capital gain. The Commissioner contends that the transaction resulted in the receipt of ordinary income, since, in his view, there was no "sale or exchange" of a capital asset within the meaning of section 117 (a) (4), Internal Revenue Code of 1939.

The record in this case is rather skimpy and there may be more to the transaction than meets the eye. Moreover, the burden of proof is upon petitioners, and if the facts disclosed should appear insufficient any doubts generated by such insufficiency must be resolved against them.

We cannot find upon this record that there was a "sale or exchange." The agreements of July 26 and July 27 are plainly interconnected and are obviously part of a single plan. Certainly, it has not been shown otherwise and the burden is upon petitioners. In essence, Skannel and Benton terminated their original agreement with General Bronze and entered into a new arrangement with General Bronze on behalf of Skanton, their controlled corporation. Under the new arrangement, Skanton became the exclusive distributor with somewhat different territory. The record does not disclose whether the new territory was more or less desirable than the old. The agreement of July 26, 1951, also spells out the abandonment by petitioners and Skanton of any "claim to inventorship" in connection with the product. It is difficult, if not impossible, to ascertain from the record whether this was a significant part of the consideration for the $17,500 in controversy.

In substance, the transaction under review appears to be simply a revision of a distributorship arrangement in which some collateral related matters are simultaneously dealt with. We have recently had occasion to comment upon the difficulties presented by cases in this field and the necessity, occasioned by the precedents, of drawing fine distinctions. *Marc D. Leh*, 27 T. C. 892. It therefore becomes all the more important that the situation in a particular controversy be clearly presented. We cannot find, on this record, that

976

there was a transfer of such character as was involved in *Elliot D. Smoak*, 43 B. T. A. 907, or *Jones* v. *Corbyn*, 186 F. 2d 750 (C. A. 10), or *Henrietta B. Goff*, 20 T. C. 561, affirmed 212 F. 2d 875 (C. A. 3), certiorari denied 348 U. S. 829. We hold that the termination of rights under the 1949 agreement here in controversy did not constitute a "sale or exchange" entitling petitioners to the favored capital gains treatment. Cf. *Commissioner* v. *Starr Bros., Inc.*, 204 F. 2d 673 (C. A. 2); *General Artists Corp.* v. *Commissioner*, 205 F. 2d 360 (C. A. 2), certiorari denied 346 U. S. 866.

*Decisions will be entered for the respondent.*