Arthur F. Brook and Ruth T. Brook v. Commissioner. Wire-O-Binding Company, Inc. v. Commissioner.
Brook v. Commissioner
Docket Nos. 3482-62, 3483-62.
United States Tax Court
T.C. Memo 1964-285; 1964 Tax Ct. Memo LEXIS 53; 23 T.C.M. (CCH) 1730; T.C.M. (RIA) 64285; October 30, 1964
*53 In 1935 petitioner Arthur F. Brook was granted an exclusive franchise, unlimited in duration, to assemble and sell a newly developed type of binding for books. On April 11, 1955, Brook entered into an agreement with the grantor whereby the duration of the franchise was limited to 15 years and the range of products covered thereby was enlarged. On April 27, 1955, Brook sold the new franchise to a newly formed corporation for $600,000, payable ratably over 15 years. The negotiations for the sale of the franchise were at arm's length. The corporation, which took over the business of the proprietorship, entered into an agreement with a partnership composed of Brook and two others, under which the partnership was to provide the corporation with machinery and the corporation was to pay one-half of its net profits as rent. Held: Brook's transfer of the franchise to the new corporation constituted the sale of a capital asset. The franchise sold by Brook (1) was a different asset from the franchise originally granted to him, (2) did not receive a carryover basis, and (3) had not been held by Brook in excess of 6 months. The payments received in exchange therefor represent short-term capital *54 gain. Held further: The new corporation is entitled to amortize the franchise at its cost over the 15-year life of the franchise. Held further: The new corporation's rental payment in the amount of $43,737.90 for 1957 was not unreasonable. Irving M. Gruber, for the petitioners. Robert D. Whoriskey, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined deficiencies in the income tax of petitioners Arthur F. and Ruth T. Brook for their taxable years ended December 31, 1956 and 1957, in the respective amounts of $18,908.77 and $18,749.44. Respondent also determined a deficiency of $34,871.89 in the income tax of petitioner Wire-O Binding Company, Inc., for its taxable year ended December 31, 1957. Arthur F. Brook and Wire-O Binding Company, Inc., will hereinafter be referred to respectively as Brook and petitioner. These proceedings have been consolidated. The sole issue for decision with regard to Brook is whether two payments, both in the amount of $40,000, received by him from petitioner in 1956 and 1957 in consideration for Brook's purported sale of a franchise to petitioner, were taxable as long-term capital gain. [1] *55 With regard to petitioner, we must decide whether respondent was correct in disallowing the deductions claimed by petitioner for the two $40,000 payments made by it to Brook. We must also decide whether respondent correctly determined that certain rentals in the amount of $43,737.90 paid by petitioner in 1957 for the use of various items of machinery were, to the extent of $36,267.90, excessive and not properly deductible as ordinary and necessary business expenses within the meaning of section 162(a)(3). [2]
Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Brook and his wife, Ruth, filed joint income tax returns for the calendar years 1956 and 1957, prepared on the cash method of accounting, with the district director of internal revenue, Albany, New York. Petitioner, a New York corporation, filed its corporation income tax return for the *56 calendar year 1957, prepared on an accrual method of accounting, with the district director of internal revenue, Manhattan, New York. Petitioner was incorporated on April 19, 1955, to take over the conduct of a bindery business which Brook had operated as a sole proprietorship under the name of Wire-O Binding Company (hereinafter referred to as the proprietorship). Brook became engaged in this business in 1935 as the result of an offer tendered him by Trussell Manufacturing Co. (hereinafter referred to as Manufacturing) through its president, C. D. Trussell, who was soon to become Brook's father-in-law. C. D. Trussell (hereinafter referred to as Trussell) explained to Brook that Manufacturing had developed a new type of binding process and that Manufacturing was searching for someone to operate a bindery in the New York City area using that type of binding. The process involved the insertion of preformed spiral wires into evenly spaced holes which would be punched into collated sheets of paper that were to be bound. Manufacturing had also developed certain machinery to be used in connection with the binding operation. During 1934 through 1936 Manufacturing or its assignor had applied *57 for patents on these various inventions. In all, six patent applications were filed. The first three applications to be filed dealt with the method or process of inserting the preformed spiral wires into the sheets of paper that were to be bound. The next three applications dealt with the machinery to be used in the binding process. One of these latter applications had to do with the wire-forming machine, the second with the wire-forming machine and the method of wire forming, and the third involved a machine capable of punching evenly spaced holes into the sheets that were to be bound. It was contemplated that the process would be used for binding checkbooks, stenographic notebooks, advertising pamphlets and material of a similar character. Trussell offered Brook an exclusive franchise to assemble and sell this binding "in the greater New York area." Brook accepted this offer in March 1935. Because the process was untried and involved a certain amount of risk, Brook was not required to pay anything for the franchise (hereinafter referred to as the original franchise). The original franchise which Brook received at that time was oral and was not reduced to writing until 1944. Prior *58 to 1944 Brook's rights under the original franchise were based upon trust and confidence in Trussell. It was Brook's understanding that the original franchise was unlimited in duration, and we so find that it was. Shortly after Brook accepted Trussell's offer, he went to Manufacturing's plant in Poughkeepsie, New York, to negotiate with regard to the machinery he would need in order to operate under this franchise. Brook at this time did not possess sufficient assets to purchase the necessary machinery. Moreover, since the binding process was untried, Brook did not wish to risk any investment in machinery. An agreement was reached whereby Manufacturing was to supply all of the equipment needed for Brook's binding operation in the greater New York area in return for 50 percent of Brook's profits. Between March 30, 1937, and September 13, 1938, patents were granted with respect to five of the patent applications filed by Manufacturing or its assignor. On December 26, 1939, a patent was granted with respect to the sixth patent application so filed. Because a patent creates a statutory monopoly for 17 years, all of these patents were to, and did in fact, expire between March 30, 1954, *59 and December 26, 1956. When Brook acquired the original franchise he did not acquire any interest in the three patents relating to the wire-forming machine, the process of wire forming, or the punching machine. The proprietorship prospered between the years 1936 through 1954, including the years 1941 through 1945 when it experienced serious operational problems stemming from wartime exigencies and various other causes hereinafter mentioned. Thus, the relevant items relating to the profits of the proprietorship during the aforesaid years are as follows: Approximate Net
Profits of Pro-
Year
Net Sales [1]
prietorship
1936
$ 28,064.40
$ 1,744.00
1937
5,350.00
1938
39,761.53
4,306.00
1939
72,166.81
5,625.00
1940
64,099.62
9,669.00
1941
8,968.00
1942
12,631.00
1943
18,260.00
1944
15,403.16
1945
16,655.96
1946
185,957.19
15,538.00
1947
223,516.14
24,038.00
1948
233,211.08
27,775.00
1949
$242,303.50
$23,707.00
1950
309,253.40
28,396.00
1951
352,529.48
32,037.00
1952
360,037.39
24,669.00
1953
488,956.76
36,494.00
1954
581,594.16
55,240.00
Manufacturing experienced a severe crisis in management in the spring of 1943 when Trussell unexplainingly ceased to carry out his functions as *60 president of that company after divorcing his wife. Trussell and his former wife, who were at that time substantial stockholders of Manufacturing, requested Brook to come to Poughkeepsie, which is approximately 75 miles from New York City where Brook had been operating his proprietorship, to assist in the management of Manufacturing. Brook was reluctant to leave his proprietorship because Robert Blissert (hereinafter referred to as Blissert), who had been employed by the proprietorship since its inception and was the only other person Brook believed to be "sufficiently acquainted with the business to possibly manage it," had been inducted into the Army. Brook, however, realized that the success of his proprietorship was dependent upon the financial well-being of Manufacturing, the proprietorship's source of the binding machinery and materials. Therefore, Brook left the proprietorship in the hands of two relatively inexperienced employees and went to work, full-time, for Manufacturing at the end of 1943. As of June 1944, Manufacturing was confronted with serious financial problems. These resulted, in part, from losses sustained by it because of rejects on war contracts. Moreover, because *61 of wartime priorities, it could not obtain sufficient quantities of wire for its binding business. Manufacturing was also threatened by the possibility of two substantial lawsuits. In an attempt to raise funds to enable it to "weather" these problems, Manufacturing's board of directors decided to sell, among other of its assets, the machinery rental agreement (including the underlying machinery) entered into with Brook's proprietorship. The asking price was set at $20,000. Manufacturing did not wish to offer the machinery rental agreement to an "outsider," first, because its need for cash was urgent, and second, because it did not want the trade to learn of its weak financial condition. In addition to Trussell's wife and C. M. Conger, then president of Manufacturing, Manufacturing solicited Blissert, who was then in the Army, and Brook's wife, Ruth, with regard to the purchase of the machinery and the rental agreement. The proprietorship was, because of wartime pressures, suffering from a shortage of materials and a lack of competent management. Conger and Trussell's wife believed the machinery rental agreement was too speculative an investment. Blissert, who believed that the proprietorship *62 would be able to "pull through" and eventally be profitable, finally agreed to purchase a one-third interest in the machinery and the rental agreement, for which he paid $6,666.66. Brook's wife agreed to purchase a two-thirds interest therein. Manufacturing effected this sale on or about July 1, 1944. Ruth Brook then gave a one-twelfth interest in her share to Brook's aunt, Mary Farrell. These three individuals on or about August 17, 1944, formed a partnership known as Brook, Blissert and Farrell, the sole function of which was to lease to the proprietorship the machinery needed in its bindery business. During the spring and early summer of 1944, when the directors and shareholders of Manufacturing were attempting to sell some of Manufacturing's assets in order to improve its financial condition, Trussell repeatedly interfered in a manner which Brook regarded as cantankerous and adverse to the best interest of Manufacturing. Having lost his confidence in Trussell and concerned that Trussell might, in some way, attempt to abrogate the original franchise (which was oral) under which the proprietorship was operating, Brook advised Conger that he wanted the original franchise reduced to *63 writing. Therefore, on August 2, 1944, Manufacturing and Brook entered into an agreement which provided, in pertinent part, as follows: THIS AGREEMENT, entered into this 2nd day of August, 1944, between [MANUFACTURING] * * * hereinafter called "patentee" and ARTHUR F. BROOK * * *, hereinafter called "licensee," WITNESSETH WHEREAS the patentee is the owner of U.S. patents numbers 2,075,168; 2,112,389; 2,114,259; 2,116,589; 2,130,318; 2,185,004 relating to or covering Wire-O process, and WHEREAS the licensee is desirous of securing from said patentee certain rights to use the inventions and any improvements which the patentee may make upon them, of said binding device in the manufacture of Wire-O products. NOW THEREFORE, for and in consideration of the mutual terms and agreements herein contained the parties hereto agree as follows: First. That the patentee hereto grants to the licensee the rights to assemble and sell Wire-O products. Second. The patentee hereby grants that during the life of this contract it will not license any other concern to manufacture or assemble Wire-O products in Greater New York without the written consent of the licensee. Third. That the patentee will *64 furnish the formed "C" shape wires constituting a part of said inventions at prices as low as made to any other comparable purchaser. Fourth. The licensee agrees to buy all formed Wire-O wires which it will use during the term of this agreement from the patentee and no one else. Fifth. The licensee shall have the right to use the trade-mark "Wire-O" on its merchandise and in advertising and publicity pertaining to this method of wire binding. Sixth. The term of this contract shall be for the life of the patents mentioned or referred to on page 1 of this contract. Seventh. This agreement shall be binding upon the parties hereto, their successors or assigns. From that time until April 11, 1955, the foregoing agreement continued to be the fundamental source of the proprietorship's rights to assemble and sell the Wire-O binding developed by Manufacturing. As we have previously found, the agreement of August 2, 1944, merely reduced the original franchise to writing. The only right which it conveyed to the proprietorship was the exclusive right "to assemble and sell Wire-O products" in greater New York. Despite the fact that as of August 2, 1944, Manufacturing may have developed two *65 new binding processes in addition to Wire-O, namely Multo-O and Flex-O, the agreement of August 2, 1944, did not convey to petitioner any rights with regard to either of the latter two binding processes. Sometime after 1946 petitioner did begin to distribute to a significant extent Multo-O and Flex-O bindings in the New York area. However, its rights to assemble and sell the Multo-O and Flex-O bindings did not arise from the original franchise as embodied in the written agreement of August 2, 1944. *
On April 14, 1948, Manufacturing filed a patent application on an automatic paper punching machine to be used in connection with the Wire-O binding process. A patent thereon was granted on June 9, 1953. That patent will expire on June 9, 1970. Because of his duties at Manufacturing, Brook was unable to devote any significant attention to the business of the proprietorship. Thus, when Blissert returned from military service in 1946, he became the sole manager of the proprietorship and continued as such until its business was taken over by petitioner in 1955. In 1955 Blissert approached *66 Brook upon several occasions and informed him that he, Blissert, wanted some kind of equity interest in the business conducted by Brook's proprietorship. Essentially, Blissert's main bargaining point was that he alone had been responsible for the success of that business for a period of 9 years. Blissert requested a 50 percent interest. Brook considered Blissert invaluable in the successful operation of the proprietorship's business. He realized that he would have to accommodate Blissert. In the ensuing negotiations between Brook and Blissert, Blissert indicated that he would prefer the business to be operated as a corporation. His reasons for this were twofold. First, Blissert wanted to limit his share of any liability that might arise in connection with the binding operation. The main risk involved was that some employee might ruin some of the printed materials submitted for binding. Damages on a single job could conceivably approach $100,000. Blissert also wanted the business to initiate a pension plan under which he would receive coverage. Since Blissert was to become an owner of the business, the business would have to be incorporated so that he could be considered an employee *67 eligible for pension coverage. These reasons also appealed to Brook. Therefore, it was decided that a corporation would be formed to take over the business conducted by the proprietorship. Since its incorporation petitioner has contributed in excess of $92,000 to its employees' pension and profit-sharing fund. Prior to the formation of the corporation, Brook, on April 11, 1955, entered into the following agreement (hereinafter referred to as the new franchise) with Manufacturing: WHEREAS an agreement was entered into on August 2, 1944, between [Manufacturing] * * * and Arthur F. Brook, * * * under which said corporation granted to said Arthur F. Brook certain rights in connection with specified inventions of the corporation and any improvements which might be made thereon, and WHEREAS said agreement referred specifically to six patents and said corporation has since secured an additional patent (#2,641,321) which expires on June 9, 1970 and which is an improvement upon one of the patented inventions referred to in the August 2, 1944 agreement, and WHEREAS, the said agreement of Aug. 2, 1944 gave to said Arthur F. Brook an exclusive franchise to manufacture, assemble and sell Wire-O *68 products in Greater New York for the life of the contract, which was to be for the life of the patents mentioned or referred to in said agreement, and WHEREAS the parties hereto desire to resolve any ambiguity in the said August 2, 1944, agreement as far as the term of said contract and as far as the products covered thereby are concerned: NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: 1. The term of the said August 2, 1944 agreement between the parties hereto shall end on June 9, 1970, that being the expiration date of patent #2,641,321, which is an improvement patent referred to in and covered by the said agreement; and the exclusive franchise of Arthur F. Brook for Greater New York shall end on June 9, 1970. 2. Since the intent of the August 2, 1944 agreement was to have the franchise cover all merchandise offered for sale by the corporation through its licensee distribution, the said agreement is hereby formally extended to cover such products as Mult-O and Flex-O as well as any other such products which Wire-O Corporation shall develop. However, neither the development of new products nor the securing of further improvement patents by the said corporation shall extend the franchise *69 agreement beyond the settled termination date of June 9, 1970. As previously indicated, Brook paid nothing for the original oral franchise granted by Manufacturing in 1935. Moreover, he was not required to pay anything at the time it was reduced to writing on August 2, 1944. Nor did he receive any money from, or pay any money to, Manufacturing in connection with his execution of the new franchise on April 11, 1955. On April 19, 1955, the petitioner (Wire-O Binding Company, Inc.) was incorporated under the laws of the State of New York in order to take over the business theretofore operated by the proprietorship. Although Blissert originally had wanted 50 percent of petitioner's stock, he finally agreed to take 40 percent. On April 26, 1955, at the first meeting of petitioner's board of directors, Blissert was elected president of the company, Brook vice-president, and Blissert's wife, Virginia, was elected secretary and treasurer. A total of 60 shares of stock in petitioner was then issued. Twenty-four shares, or 40 percent, of the stock went to Blissert and Virginia, for which Blissert paid $12,000. Brook subscribed for the remaining 36 shares, or 60 percent, of petitioner's stock *70 for which he paid $18,000. Brook retained 9 shares, or one-quarter of the stock subscribed for by him, and gave the remaining stock in equal amounts to 3 trusts established by him for each of his children, who at that time were minors. On April 27, 1955, Brook entered into an agreement with petitioner whereby he purportedly transferred to it the new franchise. This agreement between Brook and petitioner provided, in pertinent part, as follows: Whereas by agreement dated August 2, 1944, the Seller [Brook] acquired from [Manufacturing] * * * an exclusive license and franchise to manufacture, assemble, and sell Wire-O products in greater New York for the life of said agreement, * * * and Whereas a supplemental agreement was entered into on April 11th, 1955 between [Manufacturing] * * * and the Seller [Brook] detailing the term of the said August 2, 1944 agreement and specifying that said term was to end on June 9, 1970, and formally extending the said agreement so as to cover such products as Multo-O and Flex-O, as well as any other such products which [Manufacturing] shall develop, and Whereas the Purchaser [petitioner] desires to acquire from the Seller [Brook] all of his rights under *71 the said agreement of August 2, 1944, and the supplemental agreement of April 11, 1955, and the Seller [Brook] has consented to the sale and assignment of all of his rights under such agreements IT IS, THEREFORE, AGREED AS FOLLOWS: 1. The Seller [Brook] hereby sells, assigns and transfers to the Purchaser [petitioner], as of May 1, 1955, all of his right, title, and interest under said agreement of August 2, 1944 and under the supplemental agreement of April 11, 1955, and does absolutely assign the said contracts to the Purchaser [petitioner], as of said date. 2. The Purchaser [petitioner] hereby purchases all of the Seller's [Brook's] rights under the said agreements and agrees to pay therefore the sum of $600,000, to be paid at the rate of $40,000 per year in quarterly payments of $10,000 each, on the first days of February, May, August, and November of each year, commencing on August 1, 1955 and ending on May 1, 1970. Brook and Blissert conducted arm's length negotiations concerning the amounts to be paid by petitioner with regard to the new franchise. Their method of valuation was based upon a projection of earnings that the new franchise would be likely to generate during its *72 15-year life. They based this projection upon an average of the proprietorship's earnings for the preceding three years. During the years 1952 through 1954, the proprietorship earned $24,669, $36,494 and $55,240, respectively, or an average of approximately $40,000 per year. Blissert believed that he would be able to cause petitioner to earn substantially more than $40,000 per year and that petitioner was therefore purchasing the new franchise at a bargain price. Pursuant to an agreement dated April 28, 1955, petitioner agreed to assume (1) the machinery rental agreement between Brook, as lessee, and the partnership of Brook, Blissert and Farrell, as lessor; and (2) Brook's lease covering the premises occupied by the proprietorship in New York City. In addition, pursuant to that agreement, Brook transferred to petitioner all the tangible assets of the proprietorship consisting of (1) furniture, fixtures and miscellaneous equipment, for which Brook was to receive $2,596.13 and (2) the proprietorship's inventories of raw materials and work in process, for which Brook was to receive his cost computed as of May 1, 1955, which Brook and Blissert determined to be as follows: Wire-O Inventory
$ 6,650.00
Multo-O Inventory
2,840.00
Wire-O Work in Process
10,850.00
Multo-O Work in Process
1,791.50
Total
$22,131.50
The *73 opening entry, dated May 1, 1955, on petitioner's books reflects liabilities to Brook in the aforesaid amounts. Petitioner's books also reflect, as part of the opening entry, an obligation to Brook for the purchase of a "franchise and license." The record does not indicate whether petitioner has discharged all or any part of its liability to Brook arising on account of his transfer of inventory, furniture and equipment to petitioner. It is clear, however, that petitioner has paid Brook $40,000 per year pursuant to the terms of their agreement of April 27, 1955, so that at the time of the trial Brook had received $340,000 of the $600,000 which petitioner agreed to pay for the franchise. On April 28, 1955, after Brook had assigned to petitioner, and petitioner had assumed, the machinery rental agreement with the partnership of Brook, Blissert and Farrell, petitioner entered into a new agreement with said partnership concerning the rental of machinery. That agreement provided, in pertinent part, as follows: WHEREAS an agreement was entered into on July 1, 1944 between Ruth T. Brook, Robert Blissert, and Mary Farrell, co-partners doing business under the name and style of Brook, Blissert *74 and Farrell, hereinafter referred to as the Partnership, and [the proprietorship], under which the Partnership furnished to [the proprietorship] all machinery required for [its] punching and binding operations * * * and [the proprietorship] agreed to pay therefor one-half of [its] profits * * *, and WHEREAS [petitioner] * * * has purchased Brook's license and franchise to manufacture, assemble, and sell Wire-O products and other products in greater New York, and commencing on May 1, 1955 will be carrying on the business now carried on by [the proprietorship), * * * in which the machinery furnished by the Partnership is used, and WHEREAS, the parties hereto wish to arrange for the future furnishing of said machinery to the Corporation and the compensation to be paid the Partnership therefor, IT IS MUTUALLY AGREED AS FOLLOWS: 1. Commencing on May 1, 1955, the Partnership agrees to furnish to the [petitioner] all such machinery as may be required for the punching and binding operations of the [petitioner] in connection with [its] franchise to manufacture, assemble, and sell Wire-O and other products in greater New York, which franchise terminates on June 9, 1970. 2. As rental for the *75 said machinery, the [petitioner] agrees to pay to the Partnership one-half of its profits, which are to be computed before any deduction by the [petitioner]for depreciation of the franchise purchased by the [petitioner] from Brook on April 27, 1955. 3. This agreement shall take the place of agreement between the Partnership and [the proprietorship] dated July 1, 1944. During the years 1936 through 1943, the proprietorship, pursuant to the machinery rental agreement, paid to Manufacturing as rents approximately the following amounts: Approximate Payment
for Machinery
Year
Rental
1936
$ 1,744.00
1937
5,350.00
1938
4,306.00
1939
5,625.00
1940
9,669.00
1941
8,968.00
1942
12,631.00
1943
18,260.00 During the years 1944 through 1957, approximately the following amounts were paid to the partnership of Brook, Blissert and Farrell by the proprietorship or petitioner as rents pursuant to their respective machinery rental agreements with the partnership: Approximate
Approximate
Rental Pay-
Rental Pay-
ment by Pro-
ment by Pe-
Year
prietorship
titioner
1944
$15,403.16
1945
16,655.96
1946
15,538.00
1947
24,038.00
1948
27,775.00
1949
23,707.00
1950
28,396.00
1951
32,037.00
1952
24,669.00
1953
36,494.00
1954
55,240.00
1955
2,940.00 [1] *76 $29,465.16 [2]
1956
36,881.53
1957
43,737.90
As part of its obligation to furnish petitioner with the requisite machinery in connection with petitioner's punching and binding operations, the partnership became obligated to furnish any new equipment developed in this field. Ever since 1949, including the years before us, Manufacturing has been working on the development of automated machinery to insert and form the wire used in the Wire-O binding process. Petitioner and the partnership knew of the development of such machinery at the time the machinery rental agreement was entered into in 1955 and contemplated that the partnership would obtain such equipment for petitioner when it became available. According to present ecame designs, there must be a separate machine used for each capacity or diameter of wire used. Petitioner uses 10 different capacities of wire in its binding operations. It has estimated that it would need at least 10 machines. The cost of these machines has been estimated to run between $20,000 and $30,000 each. The members of the partnership have sufficient funds to provide this machinery for petitioner, and they, as well as petitioner, regard themselves *77 as obligated to do so. In 1960 Blissert acquired the 9 shares of petitioner's stock which Brook at that time owned. This left Blissert and his wife owning 55 percent of the outstanding stock in petitioner and Brook and his wife owning none. The remaining 45 percent of petitioner's stock is owned in equal proportions by Brook's children. Two of these children at the time of trial were adults, lived apart from Brook and his wife, and held legal as well as equitable title to their stock. The third child is a minor and her stock continues to be held in trust for her benefit. From the time of its incorporation through 1959, petitioner has had net sales and taxable income in approximately the following amounts: Net Profit (Before
Annual Franchise
and Machinery
Rental Pay-
Year
Net Sales
ments)
1955 [1]
$433,212.37
$58,776.39
1956
652,124.63
85,283.04
1957
809,304.62
86,976.92
1958
663,077.05
68,546.57
1959
690,978.46
80,416.55
Respondent, pursuant to a statutory notice of deficiency, increased Brook's taxable income for each of the years 1956 and 1957 by $40,000. Respondent explained this adjustment by stating: It has been determined that the amounts of $40,000.00 received by you *78 in each of the years 1956 and 1957 from [petitioner] are dividends and not capital gains. * * * In the notice of deficiency issued to petitioner for 1957, respondent disallowed a deduction in the amount of $40,000 claimed by petitioner for amortization of the franchise or license transferred to it by Brook. Respondent also disallowed, to the extent of $36,267.90, a deduction claimed by petitioner in the amount of $43,737.90 for the rental of machinery. Respondent based this latter determination upon the ground that, to the extent disallowed, the expense was not ordinary and necessary within the purview of section 162(a)(3). Opinion Tax Consequences of Brook's Transfer of His Franchise to Petitioner It is Brook's position, in essence, that he sold a franchise to petitioner pursuant to a 15-year installment contract and that the yearly payments in the amount of $40,000 received by him thereunder are taxable as long-term capital gain. Respondent has made a number of arguments to oppose Brook's contention. In the first place, respondent argues that Brook's transfer of the franchise to petitioner was, in substance, a contribution to petitioner's capital, that petitioner's obligation to *79 pay Brook $600,000 for the franchise over the 15-year period beginning 1955 and terminating in 1970 is in the nature of preferred stock and that the yearly payments thereunder are dividends. Cf. Foresun, Inc., 41 T.C. 706 (1964), on appeal (C.A. 6, April 20, 1964); 1432 Broadway Corporation, 4 T.C. 1158 (1945), affd. 160 F. 2d 885 (C.A. 2, 1947); and Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957). We are not persuaded by this argument. There have been numerous decisions involving the question whether purported sales or loans were, in fact, contributions to capital. Various criteria or factors have been utilized by the courts in their determinations of whether the transaction, in substance, is what it purports to be in form. Each case, however, must be decided on the basis of its own facts, and no single one of these factors takes precedence over the others. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). Brooks has brought to our attention a number of factors which indicate to us that his transfer of the new franchise to petitioner was not an equity contribution. One of the most significant is that *80 petitioner's obligation to Brook was to be repaid in 15 annual installments and that, of the original contract price of $600,000, Brook had at the time of the trial received $340,000, leaving an unpaid balance of only $260,000. That approximately 55 percent of petitioner's obligation to Brook had been liquidated within 9 years after Brook's transfer of the new franchise indicates to us that Brook did not intend that transaction to be a permanent equity investment in petitioner. Cf. Foresun, Inc., supra, where this Court found the taxpayer's failure to make principal payments on a purported debt instrument to be a very significant indication that a purported sale was, in fact, a capital contribution. Gooding Amusement Co., supra, is also distinguishable on this ground. Although the total amount to be paid by petitioner to Brook with regard to the new franchise had originally been determined with reference to a projection of earnings, the yearly installments paid to him were in no way dependent upon petitioner's earnings. The installment contract between petitioner and Brook called for fixed annual payments to be made without regard to the earnings of the business. See J. I. Morgan, Inc., 30 T.C. 881, 890-891 (1958), *81 reversed on another issue 272 F. 2d 936 (C.A. 9, 1959). Moreover, Brook's right to receive these installment payments was in no way subordinated to the claims of petitioner's other creditors. [3]We note that in three of the cases relied upon by respondent, Foresun, Inc., Gooding Amusement Co., and 1432 Broadway Corporation, all supra, the corporation's obligation to pay the transferor of property was subordinated to other creditors. Respondent has attempted to distinguish Brook's transfer of the new franchise to petitioner from the sale of assets which occurred in two cases relied upon by Brook, J. I. Morgan, Inc., supra; and Warren H. Brown, 27 T.C. 27 (1956). In each of those cases the transferors had reserved title to the property they transferred. Under the applicable local law, this reservation of title was tantamount to a mortgage and gave the transferors rights of possession and ownership *82 superior to the other creditors of the transferee corporation. This Court concluded that the reservation of title therein indicated that the transferors did not place their property at the risk of the business. The existence of a mortgage is only one factor, and not necessarily a determinative factor, indicating that the transferred property has not been subjected to the risk of the business. [4] Moreover, the business to which Brook was transferring the franchise had been in existence for 20 years, had net sales between the years 1946 through 1954 which steadily increased from $185,957.19 to $581,594.16, and had net profits during that period which increased from $15,538 to $55,240. These factors indicate to us that Brook was not subjecting the franchise to the risks of an untried business. Petitioner's obligation to pay Brook was safeguarded by substantial goodwill and a history of substantial profits. Under the particular circumstances before us, petitioner's high *83 debt-equity ratio (21 to 1) does not persuade us that Brook's agreement with petitioner regarding the new franchise was a contribution to capital. The existence of a high debt-equity ratio alone does not indicate that the petitioner's capitalization was inadequate. The evidence in the record suggests that petitioner's capital requirements were modest. Thirty thousand dollars were paid for its stock upon its organization. It is not clear whether this money was used to acquire the proprietorship's inventory, work in process, and furniture, fixtures and miscellaneous equipment. However, be that as it may, there is no indication that petitioner has ever required additional capital. Because of the machinery rental agreement with the partnership of Brook, Blissert and Farrell, petitioner was relieved of any capital investment in machinery or equipment. It has conducted a substantial business from its incorporation to the time of the trial. Its yearly net sales have ranged from $433,212.37 to $690,978.46 between its taxable years 1955 through 1959. The record does not indicate that petitioner has ever had to borrow money after its organization. It has shown a profit for each year since it *84 was formed and has paid Brook with regard to his franchise solely out of profits. See J. I. Morgan, Inc., supra, at 890, 892. See also Ainslie Perrault, 25 T.C. 439, 450 (1955). Respondent also contends (1) that Brook, during 1956 and 1957, was petitioner's controlling shareholder and (2) petitioner's payments to Brook with regard to the new franchise were excessive in amount, and although in the form of installments for the purchase price of property, were, in effect, dividends. Although Brook may have been petitioner's controlling shareholder, we do not believe that the amounts which petitioner became obligated to pay Brook with regard to the new franchise were excessive. In our opinion, the negotiations conducted between Brook and petitioner relating to the franchise were at arm's length. The factor which assured this is that, in substance, the negotiations were conducted between Brook and Blissert, who was a substantial shareholder of petitioner, and that Blissert's interest in this matter was adverse to that of Brook. In effect, Blissert was negotiating for an interest in property that had belonged entirely to Brook. The value of Blissert's equity in petitioner would increase *85 in reverse proportion to the amounts to be paid by petitioner to Brook. It also is apparent that Brook was not in a position to force Blissert into making excessive payments with regard to the franchise. Brook regarded Blissert's services as invaluable to the successful operation of his bindery business, and we have found that it was only in an effort to retain Blissert's services that Brook capitulated to Blisser's demands for an interest therein. Moreover, both Brook and Blissert seem to us to be competent businessmen who were intimately acquainted with all the aspects and phases of the bindery business conducted by the proprietorship. Under these circumstances, we cannot find that in their negotiations Brook and Blissert arrived at any figure other than the fair market value of the franchise transferred to petitioner. Having decided that petitioner's contractual obligation to pay Brook $600,000 in annual installments of $40,000 did not give Brook an increased equity interest in petitioner, we further conclude that said contractual obligation did not constitute a security under section 351. As this Court noted in Warren H. Brown, supra, at 36: The question whether an evidence of *86 indebtedness constitutes a security does not depend for its resolution upon a simple determination of the length of time the obligation is to run, but depends rather upon an over-all evaluation of the nature of the debt so as to ascertain whether or not the instrument issued evidences a continuing interest in the affairs of the corporation. Cf. also Wellington Fund, Inc., 4 T.C. 185, 189 (1944). The only investment Brook had in petitioner was his stock. Petitioner's installment obligation was not intended to give Brook a continuing investment or stake in petitioner's business. On the contrary, the purpose of the contract was to liquidate, as quickly as was consistent with petitioner's business and financial exigencies, all of Brook's interest, other than that arising in connection with his stock ownership, in petitioner's economic well-being. Therefore, petitioner's contractual obligation to pay Brook for the franchise is not a security within the meaning of section 351. In his opening statement respondent, in addition to making the foregoing arguments, affirmatively asserted that Brook's agreement with petitioner regarding the franchise was a mere license which gave rise to ordinary *87 income. Respondent has apparently abandoned the point; for he did not raise it on brief, nor did he make any effort at the trial to show that the agreement of April 27, 1955, between Brook and petitioner was a license. At this juncture, we shall undertake to examine more particularly the nature of the rights which Brook transferred to petitioner on April 27, 1955; for not only will such examination establish that the transfer of the new franchise was not a mere license, but it will also be helpful in resolving the next issue raised by respondent, i.e., whether the franchise sold by Brook was a capital asset. It is clear that as of the time Brook entered into the new agreement with Manufacturing on April 11, 1955, none of the original six patents had more than 20 months to run prior to expiration, and that 5 of the 6 original patents had already expired or would expire within 6 months' time. The only patent relating to Wire-O binding which had any substantial remaining useful life was an improvement patent for an automatic punching machine. This patent had a remaining life of approximately 15 years. Furthermore, the record before us indicates that of the original 6 patents, it was only *88 in regard to the patents on the wire-forming machine and wire-forming method that there was any likelihood of the effectuation of improvements. However, we have found that at no time, either by virtue of the original franchise or the new franchise, did Brook ever acquire any kind of interest in the wire-forming machine, the wire-forming process or the punching machine. Brook's only rights to use these machines arose solely by virtue of the machinery rental agreements with Manufacturing and the partnership. Thus, regardless of whether the original franchise constituted, on the one hand, an assignment or sale to Brook of the patents relating to the method of inserting the preformed wires, or, on the other hand, whether it constituted a mere license permitting Brook to use that method in the greater New York area, it is clear that by April 11, 1955, such rights would have been of little practical value. By a process of deduction, it appears to us that the only rights of practical significance or value which Brook possessed under the original franchise immediately prior to April 11, 1955, were the right to purchase Wire-O products from Manufacturing, the right to use the Wire-O trademark *89 on its merchandise and in advertising publicity pertaining to that method of wire binding, and the right to exclude any other person in the greater New York area from so doing for an unlimited period. The original franchise was changed in two significant ways by the agreement of April 11, 1955. First of all, Brook's exclusive rights to purchase from Manufacturing were extended to cover certain other binding materials developed by Manufacturing; and, secondly, the term of these rights was specifically limited to a fixed period of 15 years. By virtue of the agreement of April 27, 1955, Brook conveyed to petitioner all the rights he possessed with regard to Wire-O products and the other binding processes developed by Manufacturing and mentioned in the new franchise. In so doing Brook was not acting as the agent for Manufacturing. Cf. Federal Laboratories, Inc., 8 T.C. 1150, 1157-1158 (1947). In view of the foregoing, we hold that Brook's transfer of the new franchise to petitioner was a bona fide sale, that the gain realized by Brook in connection therewith is recognizable, and that petitioner's proper basis in the franchise at the time of its acquisition was its fair market value, $600,000. *90 Although we agree with Brook to the extent he claims that he sold the new franchise to petitioner, we must now determine whether Brook is entitled to treat the sales proceeds as long-term capital gain. Respondent has argued on brief that the franchise was not a capital asset because, in essence, it was merely a right to receive future income. The franchise sold by Brook to petitioner did not involve a mere right to perform services and receive compensation in return therefor. Cf. Paul Small Artists, Ltd., 37 T.C. 223 (1961); and Holt v. Commissioner, 303 F. 2d 687 (C.A. 9, 1962), affirming 35 T.C. 588 (1961). While we do not believe that either the original franchise or the new franchise gave Brook any right or interest in the patents or the underlying inventions, we nevertheless believe that they did give Brook some kind of enforceable estate in the Wire-C binding process and in the substantial goodwill that had been built up in connection with the name of the process. Cf. Commissioner v. Ferrer, 304 F. 2d 125 (C.A. 2, 1962) at 130-131, modifying 35 T.C. 617 (1961). At the very least, the original franchise, as well as the new franchise, gave. Brook the right to exclude others *91 in the greater New York area from assembling and selling Wire-O products and from using the Wire-O trademark and goodwill. In our opinion, this right was a proprietary right. It is also our opinion that this right constituted a capital asset. See Jones v. United States, 96 F. Supp. 973 (D. Colo. 1951), affd. 194 F. 2d 783 (C.A. 10, 1952); and Rev. Rul. 55-374, C.B. 1955-1, 370. Cf. Federal Laboratories, Inc., supra, at 1157-1158, See also Dairy Queen of Oklahoma v. Commissioner, 250 F. 2d 503 (C.A. 10, 1957), reversing 26 T.C. 61 (1956); Moberg v. Commissioner, 305 F. 2d 800 (C.A. 5, 1962), reversing 35 T.C. 773 (1961); Gowdey's Estate v. Commissioner, 307 F. 2d 816 (C.A. 5, 1962), reversing in part and affirming in part a Memorandum Opinion of this Court; and Moberg v. Commissioner, 310 F. 2d 782 (C.A. 9, 1962), reversing in part and affirming in part 35 T.C. 773 (1961), all involving Dairy Queen. Although the various courts involved in the Dairy Queen cases may have disagreed as to whether or not the seller had parted with all of his rights to the franchise in the particular circumstances before them, all the courts, nevertheless, agreed that where a seller had so *92 parted with all of his rights to a franchise, he should be treated as having sold or exchanged a capital asset, unless of course, he came within any of the statutory exceptions to the definition of a capital asset. The franchise sold by Brook did not come within any of these exceptions. Although the new franchise was limited in duration (cf. section 1221(2)), it was not property used in Brook's trade or business; for Brook had acquired the franchise on April 11, 1955, and held it solely for the purpose of transferring it to petitioner. See Acro Manufacturing Co., 39 T.C. 377, 384 (1962), affd. 334 F. 2d 40 (C.A. 6, 1964) [6]
However, Brook is not entitled to treat the sales proceeds as long-term capital gain inasmuch as he failed to hold the new franchise for the requisite six months' period. See section 1222(3). [7] In fact, as we view the circumstances before us, Brook's holding *93 period for the new franchise purchased by petitioner was barely in excess of two weeks. This determination rests upon two conclusions we have reached. These are: (1) that the franchise Brook sold to petitioner on April 27, 1955, was an entirely different asset or "piece of property" from the original franchise which Brook held from March 1935 to April 11, 1955, and (2) that Brook's acquisition of the new franchise did not come within any of the "nontaxable exchange" provisions of the Internal Revenue Code of 1954 so as to entitle Brook to "tack on" to the new franchise his holding period for the old franchise. Cf. section 1223. [8] With regard to our first conclusion, we have found that the franchise originally granted Brook by Manufacturing, although oral, was unlimited in duration. The agreement of August 2, 1944, between Brook and Manufacturing merely reduced *94 to writing the original franchise granted to Brook. [9] Moreover, the original franchise, as embodied in the agreement of August 2, 1944, conveyed to Brook the exclusive right "to assumble and sell Wire-O products in Greater New York." By virtue of the agreement entered into by Brook and Manufacturing on April 11, 1955, the term of the franchise was specifically limited to a period of 15 years and the scope of the franchise was extended to cover certain other binding processes developed by Manufacturing, other than Wire-O. The agreement of April 11, 1955, was no mere clarification or modification of the original franchise. The original franchise granted to Brook, as embodied in the August 2, 1944, agreement, was a capital asset in Brook's hands. That franchise, although used in his trade or business, could not, because of its unlimited duration, have qualified as property subject to the allowance for depreciation (even if Brook had a cost or other basis therein to depreciate). See section 1221(2). The new franchise which Brook held as a result of the agreement of April 11, 1955, came within the statutory definition of a "capital asset" solely because Brook did not intend to use that *95 franchise in his trade or business, but intended to sell it to petitioner shortly thereafter, which he did, in fact, do. See Arco Manufacturing Co., supra.[10]
A review of all the circumstances attending the execution of the agreement *96 of April 11, 1955, as well as an appraisal of the testimony of Brook and Blissert, indicates to us that Brook and Manufacturing intended to terminate the franchise theretofore existing between them and to create a new agreement more suitable to petitioner (because it would be subject to the allowance for depreciation or amortization), to whom it was contemplated that the franchise would be transferred. Cf. Badgett v. United States, 175 F. Supp. 120 (W.D. Ky. 1959)*
Our second conclusion, that Brook may not use his holding period for the original franchise as his holding period for the new franchise, is based upon our belief that the execution of the agreement of April 11, 1955, by Brook and Manufacturing did not constitute a sale or exchange. James A. Skannel, 27 T.C. 974 (1957); Marc D. Leh, 27 T.C. 892 (1957), affd. 260 F. 2d 489 (C.A. 9, 1958). Nor do we believe that the new franchise can be regarded as something received "by a distributor of goods for the cancellation of a distributor's *97 agreement" pursuant to section 1241;[11] for Brook's capital investment in his proprietorship was not, in our opinion, substantial. As we view the facts, the execution of the agreement of April 11, 1955, by Brook and Manufacturing effected a termination and cancellation of the original franchise and gave rise to a new franchise. Marc D. Leh, supra; and James A. Skannel, supra.[12] *98 *99 *100 Since this transaction was neither a sale nor exchange and since Brook paid nothing for the new franchise, his basis therein was zero. Inasmuch as Brook held the new franchise for less than the requisite period and had a zero basis therein, the entire amount received by Brook from petitioner pursuant to the installment contract constitutes short-term capital gain. Petitioner's Amortization of the Franchise Purchased from Brook Respondent has raised on brief the argument that petitioner should not be allowed any amortization deduction with respect to the franchise because the principal purpose of Brook's acquisition of control of petitioner was the evasion or avoidance of Federal income tax within the meaning of section 269. We believe that the findings of fact relied upon and the conclusions expressed in our disposition of the first issue herein amply indicate that business reasons, rather than tax avoidance motives, constituted the principal purpose behind the formation of petitioner. In view of the conclusions reached in the first issue herein, it is our opinion that the amortization deduction claimed by petitioner with regard to the franchise for its only taxable year in issue, 1957, is proper and should therefore be allowed. Reasonableness of the Machinery Rental Paid by Petitioner Petitioner leased substantially all of the equipment used by it in its punching and binding operations from the partnership of [Ruth] Brook, Blissert, and Farrell, pursuant to an agreement dated April 28, 1955, obligating petitioner to *101 pay as rent "one-half of its profits, which are to be computed before any deduction by the [petitioner] for depreciation of the franchise purchased by the [petitioner] from Brook on April 27, 1955." Pursuant to this agreement, petitioner paid the partnership $43,737.90 as rent for the year 1957 and claimed a deduction pursuant to section 162(a)(3) for the full amount thereof. Respondent contends that the fair rental value of the machinery in question was no more than $7,470 and has disallowed the claimed deduction to the extent of $36,267.90. Respondent has introduced a substantial amount of evidence to the effect that the fair rental value of the particular equipment leased by petitioner was not in excess of $7,470. However, respondent has failed to take into consideration the fact that the partnership's obligation under the rental agreement to provide petitioner with the requisite machinery to be used in its binding operations included the obligation to furnish petitioner with any new equipment developed in this field. We have found in our findings of fact that automated equipment for use in petitioner's binding operations was in the process of development at the time the rental *102 agreement was entered into and that the partnership contemplated that it would be required to supply petitioner with such machinery. We have also found that the partnership would probably be required to expend approximately $200,000 to $300,000 to provide petitioner with such machinery. We have set forth in our findings of fact, with some degree of specificity, the various facts and circumstances relating to the acquisition of the machinery rental agreement and the underlying machinery by the partnership. At this point it suffices to state that we believe the partnership acquired the machinery and machinery rental agreement in connection with a legitimate business transaction which was not motivated by tax avoidance reasons on the part of the proprietorship, Manufacturing, or any of the individual members of the partnership of Brook, Blissert and Farrell. Nor do we believe tax avoidance reasons motivated the execution of the new machinery rental agreement on April 28, 1955, between the partnership and petitioner. In view of the potential liability of the partnership under the rental agreement, we do not believe that a rental equal to 50 percent of petitioner's profits is unreasonable *103 even though under that formula the rental for the machinery amounted to $43,737.90. Decision will be entered under Rule 50 in Docket No. 3482-62. Decision will be entered for petitioner in Docket No. 3483-62. Footnotes
1. Petitioners in Docket No. 3482-62 have agreed to certain minor adjustments made by respondent in their taxable income for the year 1956.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
1. Net sales for 1937 and 1941 through 1945 not indicated in the record.↩
*. This paragraph was added by official order of the Tax Court, dated December 4, 1964, and signed by Judge Fay↩.
1. January 1, 1955, to April 30, 1955. 2. May 1, 1955, to December 31, 1955.↩
1. May 1, 1955 to December 31, 1955.↩
3. Although the amount of petitioner's profits upon which the machinery rental payments were to be based was required to be computed without regard to petitioner's amortization of the franchise, Brook's right to be paid for his franchise was in no way subordinated to the machinery rental payments.↩
4. Under some circumstances, the fact that a transferor of property has retained title thereto or taken a mortgage thereon is indicative that no sale has occurred but rather the property has been leased, loaned, or licensed.↩
6. Although Brook intended to sell the new franchise to petitioner, it would not have been excluded from the statutory definition of a capital asset on the ground that it was property held primarily for sale to customers in the ordinary course of trade or business. See Nulex, Inc., 30 T.C. 769, 775-776↩ (1958).
7. (3) Long-term capital gain. The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent that such gain is taken into account in computing taxable income. ↩
8. Sec. 1223 provides, in pertinent part: For purposes of this subtitle - [Not reproduced.] * * *↩
9. It has been conceded on behalf of Brook that the terms of the agreement of August 2, 1944, were unclear. Therefore, we may resort to parol evidence to ascertain its meaning. Brook testified that the August 2, 1944, agreement was merely a written embodiment of the terms of the oral franchise between himself and Manufacturing. Brook also testified that he understood the franchise to be unlimited in duration. Moreover, the language of the August 2, 1944, agreement readily lends itself to an interpretation that the franchise was unlimited in duration. The said agreement provides, in pertinent part: WHEREAS [Manufacturing] is the owner of [certain patents] relating to or covering Wire-O process, and WHEREAS [Brook] is desirous of securing from [Manufacturing] certain rights to use the inventions and any improvements which [Manufacturing] may make upon them, of said binding device in the manufacture of Wire-O products. [Italics supplied] ↩
10. See footnote 6, supra.↩
*. The phrase "as well as an appraisal of the testimony of Brook and Bllssert" was added to this sentence by official order of the Tax Court, dated December 4, 1964 and signed by Judge Fay↩.
11. SEC. 1241. CANCELLATION OF LEASE OR DISTRIBUTOR'S AGREEMENT.
Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement (if the distributor has a substantial capital investment in the distributorship), shall be considered as amounts received in exchange for such lease or agreement.↩
12. Even if the execution of the April 11, 1955, agreement did constitute a sale or exchange, rather than a cancellation of the original franchise and the creation of a new one (cf. Commissioner v. Ferrer, 304 F. 2d 125, 130-131 (C.A. 2, 1962), modifying 35 T.C. 617 (1961)), Brook, in any event, would not have been entitled to a "carryover" basis or to "tack on" to the new franchise the holding period of the old. The reason for this is that the transaction would not have qualified under any of the "nontaxable exchange" provisions of the Code. The only possible "nontaxable exchange" provision under which the transaction might have qualified, had it constituted an exchange, is sec. 1031, which deals with the "exchange of property held for productive use or investment." However, that section is inapplicable for two reasons. First of all, the new franchise received by Brook did not constitute "property held for productive use in trade or business or for investment," since Brook, at all times relevant hereto, intended to sell the new franchise to petitioner. Cf. Acro Manufacturing Co., 39 T.C. 377, 384 (1962), affd. 334 F. 2d 40 (C.A. 9, 1964). See also Badgett v. United States, 175 F. Supp. 120 (W.D. Ky. 1959); and Regals Realty Co., 43 B.T.A. 194 (1940), affd. 127 F. 2d 931(C.A. 2, 1942). Moreover, it would seem that since Brook's original franchise, as well as the new franchise, was merely a chose in action, the nonrecognition provisions of sec. 1031 would not be applicable because of the specific language therein excluding from its scope the exchange of choses in action. Cf. sec. 1031 which provides, in pertinent part: (a) Nonrecognition of Gain or Loss from Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. Thus, if the execution of the April 11, 1955, agreement were an exchange, gain, measured by the difference between Brook's basis in the old franchise (zero) and the fair market value of the new franchise ($600,000), would have been recognizable at that time. Brook's basis in the new franchise would have been its fair market value, $600,000.